PEWEE COAL CO., Inc. v.
UNITED STATES.

No. 46541.

United States Court of Claims.

Feb. 6, 1950.

Madden, J., dissented.

Burr Tracy Ansell, Washington, D. C., for plaintiff.

Robert E. Mitchell, Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, JJ.

WHITAKER, Judge.

Plaintiff, the operator of a coal mine, sues to recover its operating loss during the time the Government was in possession of its mine from May 1, 1943, to October 12, 1943.

When the Government took possession it appointed plaintiff's president as the Operating Manager of the business and instructed him to continue to operate the mine and to sell coal as theretofore, unless otherwise directed. Plaintiff continued operations without any interference on the part of the Government, except in one respect, to be mentioned later. Plaintiff determined the method of operation, determined whether to continue operations in this place or that, or to discontinue them altogether. Plaintiff sold its coal to whom it pleased and at whatever price it could get for it. It collected for coal sold and put the money in its own treasury.

It did all this without let or hindrance from the Government. It operated its business precisely as it had before the Government took possession of it, except in the one instance referred to above. However, it was at all times subject to Government control and direction.

Plaintiff says that at the Government's direction it continued operations beyond the time it believed it advisable to do so, but the proof does not support this contention. As the findings show, plaintiff made its own determination as to whether to continue or discontinue operations, and this without any direction from the defendant or even without any consultation with it.

The Government seized coal mines throughout the country, including plaintiff's, in an effort to end a strike of the United Mine Workers that threatened to seriously cripple our prosecution of the war. Notwithstanding the disastrous consequences of their action, the United Mine Workers could not be induced to work for the mine owners unless their demands were met, and the owners would not meet their demands. In this extremity the Government decided it would seize the mines, in the belief that while the miners would not work for the owners, they would work for the Government. Accordingly, the President issued an order on May 1, 1943, directing the Secretary of the Interior to take immediate possession of all mines in which there was a strike, insofar as this was necessary in the judgment of the Secretary. He was directed to take possession of "all real and personal property, franchises, rights, facilities, funds and other assets used in connection with the operation of such mines, and to operate or arrange for the operation of such mines in such manner as he deems necessary for the successful prosecution of the war. * * *"

In carrying out the order he was directed to act through "such public or private instrumentalities or persons as he may designate." It was further ordered: "He shall permit the management to continue its managerial functions to the maximum degree possible consistent with the aims of this order."

On the same day, the Secretary of the Interior issued an order taking possession of most of the mines, including plaintiff's. This order read in part:

"I * * * therefore take possession of each such mine including any and all real and personal property, franchises, rights, facilities, funds and other assets used in connection with the operation of such mine * * *.

"The president of each company (or its chief executive officer) specified in Appendix A attached hereto, is hereby and until further notice designated Operating

Manager for the United States for such mine and is authorized and directed, subject to such supervision as I may prescribe, and in accordance with regulations to be promulgated by me, to operate such mine and to do all things necessary and appropriate for the operation of the mine, and for the distribution and sale of the product thereof.

"All the officers and employees of the company are serving the Government of the United States and shall proceed forthwith to perform their usual functions and duties in connection with the operation of the mine and the distribution and sale of the product thereof, and shall conduct themselves with full regard for their obligations to the Government of the United States.

\* \* \* \* \* \*

"The Operating Manager for the United States shall forthwith fly the flag of the United States upon the mining premises, post in a conspicuous place upon the premises on which such mine is located a notice of taking possession of the mine by the Secretary of the Interior, and furnish a copy of such notice to all persons in possession of funds and properties due and owing to the company."

By a subsequent order the Secretary of the Interior appointed 11 Regional Managers, who were given "full powers of supervision and direction of the operation of all coal mines in their territorial jurisdiction during the period in which possession has been taken and continues under the authority of the Executive Order." Where necessary, they were authorized "to issue \* \* \* specific directions as to the production, sale and distribution of coal by the mines subject to their supervision, and as to all operating and financial arrangements of such mines." Paragraph 6 of this order read: "The Operating Managers for the United States appointed by me to operate the several mines, possession of which has been taken by me, as well as all other officers, mine workers and employees, shall serve on behalf of the United States, shall act in recognition of the resulting responsibilities and obligations, and shall be subject to the supervision and directions of the Regional Bituminous Coal Managers but shall not be officers or employees of the United States".

Plaintiff's president accepted appointment as Operating Manager, and, in accordance with the Secretary's direction, he took the following oath: "I solemnly undertake to serve the United States and devote myself to the task of producing coal so that the work of winning the war may not falter. I am flying the flag of the United States on the mining premises to show that property is being operated exclusively for the United States and that all employees, including myself, who serve the mine are serving their country. The mine I am operating for the United States is known as the Pee-wee Coal Company."

The Operating Manager was directed to proceed so far as practicable in accordance with previously prevailing policies, but he was directed to "set books up so as to keep separate the period of Government operation."

Upon receipt of the oath the Secretary issued to plaintiff's president a certificate of appointment as Operating Manager for the United States.

Paragraph 5, 6 and 7 of this certificate read as follows:

"(5) The Operating Manager, in respect to all ordinary transactions, shall proceed, so far as practicable, in accordance with the customary procedures and policies of the company previously operating the mines, and shall continue to discharge specific arrangements, contractual or otherwise, entered into by the company and to incur obligations and to enter into contracts.

"(6) The Operating Manager shall enter into such financial transactions, either by way of receipt or expenditure, as are necessary to the continuation of the operation as a going enterprise, utilizing for this purpose any or all funds or properties due or owing or belonging to the company previously operating the mines, and shall draw upon the funds and accounts of the company, utilizing customary sources of credit or funds, and make all necessary disbursements.

"(7) The Operating Manager shall inform banks, creditors, debtors, and other persons having funds or properties due and owing or belonging to the company previously operating the mine that the rights to the funds or properties are now in the possession of the Government of the United States and that the operation of the company's mines will until further notice be conducted for the Government."

But, while the defendant thus asserted the complete right to direct and control, it, in fact, never exercised this right, except in the one instance mentioned later.

■ Plaintiff seeks to recover under the Fifth Amendment providing for just compensation when private property is taken by the Government. The defendant says it did not take plaintiff's property, but this position cannot be maintained unless we say that the President's Executive Order May 1, 1943, No. 9340, and the order of the Secretary of the Interior taking possession of the mine, the oath which the Operating Manager was required to take, and the certificate of appointment issued to the Operating Manager, were all pretense and sham.

All of these things were done in order to induce the miners to return to work. It was done in the belief that they would be willing to work for the Government, although they were unwilling to work for the private owners. We are loath to say that the Government practiced a fraud upon them. Every effort was made to make it appear that the mines were being operated by the Government, and we can not bring ourselves to say that all this was a premeditated fraud. An old Persian proverb says that "the priceless ingredient of every product is the honor and integrity of its maker." If the Government was dishonest, if its protestations were lacking in integrity, what is there left in which we can place our trust? The Secretary undoubtedly undertook to take possession of the mines and undertook to make it appear that he had done so, and his authority to do this has not been questioned. We cannot but hold that the Government did in fact, as well as in name, take possession of plaintiff's mine, and that it is liable for whatever consequences flow therefrom.

In the case of United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, it was contended that miners working in mines that had been seized by the Government were Federal employees and that, therefore, the prohibition against injunctions in labor disputes contained in the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., did not apply. The court said, 330 U.S. page 284, 67 S.Ct. page 691, that Congress, in passing the War Labor Disputes Act, 50 U.S.C.A.Appendix, § 1501 et seq., "intended that by virtue of Government seizure, a mine should become, for purposes of production and operation, a Government facility in as complete a sense as if the Government held full title and ownership." The court pointed to the agreement entered into between the United Mine Workers and the Secretary of the Interior providing for wages and operating conditions, and then said, 330 U.S. page 288, 67 S.Ct. page 693: "The defendants, however, point to the fact that the private managers of the mines have been retained by the Government in the role of operating managers with substantially the same functions and authority. It is true that the regulations for the operations of the mines issued by the Coal Mines Administrator provide for the retention of the private managers to assist in the realization of the objects of Government seizure and operation. The regulations, however, also provide for the removal of such operating managers at the discretion of the Coal Mines Administrator. Thus the Government, though utilizing the services of the private managers, has nevertheless retained ultimate control."

The court concluded: "We hold that in a case such as this, where the Government has seized actual possession of the mines, or other facilities, and is operating them, and the relationship between the Government and the workers is that of employer and employee, the Norris-LaGuardia Act does not apply."

The material facts in that case and this case are the same. The only difference is that in that case the seizure was under the

War Labor Disputes Act, whereas this seizure was prior to the passage of that Act. This, however, seems to us immaterial, since in this case the authority of the Secretary of the Interior to seize the mines is not put in question.

There is in question, however, the liability of the Government for this seizure.

 Ordinarily, the measure of liability where the Government takes temporary possession of property is its rental value. United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390. Plaintiff in this case, however, sues not for the rental value of its mine, but for the losses sustained in operating it while the Government was in possession. In our opinion, there can be no recovery on this basis, because there is no showing that the Government's seizure of the mines caused the loss in operations. Marion & Rye Valley Railway Co. v. United States, 270 U.S. 280, 46 S.Ct. 253, 255, 70 L.Ed. 585.

It is not necessary for us to determine what caused the loss, if it is not shown that the Government caused it, but the findings indicate that the loss was caused, not by the Government's seizure, but by bad mining operations, and by reason of the fact that during this period they ran into a "fault" in the coal seam which made operations unprofitable, and, in fact, later caused the abandonment of the mine.

When this fault was discovered plaintiff made its own determination as to whether or not to continue operations in an effort to get through the fault, without any counsel, advice or directions on the part of defendant.

The approved method of operating a coal mine is to drive the entry in as far as it is ever desired to go, and then to work back toward the opening. This is called the "on the retreat" method of operation. Plaintiff, however, worked forward, or, as it is expressed, "on the advance." This means that it would drive the entry in part way and begin mining the rooms at once, advancing the entry as the coal was mined. In mining the rooms plaintiff did not leave sufficiently strong pillars of coal to support the roof and it caved in. This made it impossible to drive the entry in further and mine the rest of the coal in the seam. Together with the fault which was encountered, this was probably the cause of the operating loss.

At any rate, the proof fails to show that the loss was caused by the Government's seizure.

In Marion & Rye Valley Railway Co. v. United States, supra, the plaintiff sought to recover because of the alleged seizure of its railroad by the President on December 26, 1917. On that date the President issued a Proclamation, 40 Stat. 1733, in which he said: "[I] do hereby * * * take possession and assume control at 12 o'clock noon on the twenty-eighth day of December, 1917, of each and every system of transportation · * * * consisting of railroads, * * *" including the plaintiff railroad.

Of the effect of this the court said: "* * * He did not at any time take over the actual possession or operation of the railroad, did not at any time give any specific direction as to its management or operation, and did not at any time interfere in any way with its conduct or activities. The company retained possession and continued in the operation of its railroad throughout the period in question. The railroad was operated during the period exactly as it had been before, without change in the manner, method or purpose of operation. The railroad did not serve any military camp, nor did it transport troops or munitions. The character of the traffic remained the same. Nothing appears to have been done by the Director General which could have affected the volume or profitableness of the traffic or have increased the requirements for maintenance or depreciation, and apparently it retained its earnings, expended the same as it saw fit, and, without accounting to the government, devoted the net operating income to the company's use."

 The court held that there could be no recovery "because nothing of value was taken from the company, and it was not subjected by the government to pecuniary

loss, nominal damages are not recoverable in the Court of Claims. Grant v. United States, 7 Wall. 331, 338, 19 L.Ed. 194."

As in that case, so in this, nothing of value was taken from the company nor was it subjected by the Government to pecuniary loss, so far as the proof shows.

There is, however, one exception to this: The wage agreement, under which the mines were operated prior to the strike, provided $20 as vacation compensation. The War Labor Board on May 25, 1943, after the Government's seizure of the mines, modified the agreement by authorizing a vacation payment of $50 and the refund of occupational charges like rentals on mine lamps. As we understand, this finding of the War Labor Board was not obligatory on plaintiff, but the Secretary of the Interior, acting through the Solid Fuels Administration, instructed the Operating Managers to carry the Board's decision into effect. Plaintiff did this, as ordered, at a cost to it of $2,241.26. This is an extra expense of operation occasioned by the Government, for which we think plaintiff is entitled to recover. See Wheelock Bros., Inc. v. United States, Ct.Cl., 88 F.Supp. 278. Judgment for this amount will be entered. It is so ordered.

HOWELL and LITTLETON, JJ., and JONES, Chief Judge, concur.

MADDEN, Judge (dissenting).

I am unable to agree with the court's decision. It awards to the plaintiff $2,241.26 as an extra expense of operation occasioned by the Government. This extra expense consisted of an increased vacation allowance to the plaintiff's workman, and the refund to them of occupational charges like rentals on mine lamps. The court has not found that the plaintiff could have operated its mine without making the concessions directed by the War Labor Board, nor has it found what the losses to the plaintiff would have been if the Government had not intervened and the strike had continued. I think that the court is not justified in awarding the plaintiff the amount of these expenditures when it does not and, I think, could not, find that the plaintiff was, in fact, financially harmed by the Government's acts.

The question of whether or not there was a taking by the Government is somewhat more difficult that the similar question in Wheelock Bros., Inc. v. United States, Ct.Cl., 88 F.Supp. 278. I am of the impression that there was not a taking, within the meaning of the Constitution, but I think it is unnecessary to decide that question since, as I see it, no harm to the plaintiff has been shown.