**UNITED STATES v. DOUGLAS.**
**No. 13564.**

United States Court of Appeals
Ninth Circuit.

Oct. 9, 1953.

---

**382**

J. Edward Williams, Acting Asst. Atty. Gen., Washington, D. C., Bernard H. Ramsey, Special Asst. to the Atty. Gen., Yakima, Wash., John F. Cotter, Edmund B. Clark, Attorneys, Dept. of Justice, Washington, D. C., for appellant.

Roy A. Redfield, Spokane, Wash., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

This proceeding was instituted by the United States to condemn land of appellee Douglas for the use of the Atomic Energy Commission. The land was a quarter section located in, and a part of the Columbia Basin Project in the State of Washington. The Act which authorized the project's construction [1] required the owners of each farm unit as a condition precedent to receiving water from the project, to execute a contract providing that such land owner should not, until five years after water became available for such unit, sell or convey his land for a consideration exceeding the value at which it was appraised by the Secretary of the Interior. Such appraisal was required to be made, and the land evaluated "without reference to or increment on account of the construction of the project." Douglas signed such a contract. His farm unit, the quarter section mentioned,[2] was appraised at $1353.01, approximately $8 per acre. This represented the Secretary's determination of the value of the land in its raw, dry land state.

Upon the trial, in the district court, of the issue of the amount of compensation to be fixed for the taking of the Douglas tract, the United States contended that the amount awarded could not exceed this appraised value since Douglas could not have sold his land for any greater amount at the time of the taking. This is the sole question presented on this appeal. Foundation was laid for its presentation here, by motion for a directed verdict in an amount not exceeding such appraisal, and, when that motion was denied, by objection taken to the court's charge which permitted the jury to arrive at land values not so limited. Judgment was upon a verdict for $9,365.03, about $57.50 per acre.

Facts shown at the trial and not under question here are as follows: Douglas first went on the land in 1912, and lived there until October, 1913, staying long enough to qualify for his homestead patent. Since then the land has been unused. Water will probably be available for this land in 1954. We take judicial notice that although the project is still under construction, portions of its lands are now under irrigation.[3]

In rejecting the Government's contention that the amount awarded could not

---

1. 57 Stat. 14, Act of March 10, 1943, 16 U.S.C.A. § 835 et seq.

2. The Act also required such a landowner to dispose of irrigable land in excess of a nominal quarter section. As Douglas' land was such a quarter section of 162.87 acres, he was not affected by that requirement.

3. "Irrigation was begun on 5,400 acres in 1948; large-scale irrigation began May, 1952, water being released to 920 farm units and 87,000 acres." The World Almanac, 1953, p. 185.

exceed the contract's price limitation, the trial judge expressed the view: "It seems to me obvious that while we haven't a market here, because the owner is precluded from selling at the time of taking for more than the appraised value, nevertheless he has a value there that obviously exceeds the appraised value so far as his retained acreage is concerned, because no man in his senses would sell this land for $8.00 an acre on March 15, 1951, and if somebody could step into Mr. Douglas' shoes I think they would pay substantially more." [4] Accordingly the court instructed the jury: " * * * we resort to this method I have described to you of imagining a buyer and imagining a seller. They're purely theoretical persons. It isn't a question of what Mr. Douglas might take for his land; it's a question of what under all the circumstances disclosed by the evidence this imaginary seller would sell for to an imaginary buyer who is not required to buy, but willing to buy, both of them acting openly and freely and voluntarily, what price would they likely arrive at in negotiations of that kind where both of them were fully informed and knew what was to be sold on the one hand, and what was to be purchased on the other. * * * In determining market value on the basis of this theoretical buyer and this theoretical seller, you should assume that the sale was to be made of the land together with the contract water right under the contracts pertaining to the land, with all the advantages and disadvantages that go with them. You should assume, however, that the seller would be free to sell for whatever price he could obtain from the theoretical or imaginary buyer, without being limited or bound by the appraised value placed upon the land by the Reclamation Bureau. The theoretical buyer, however, would as of the date of taking, so far as the contracts are concerned, step into the shoes of Mr. Douglas and would be entitled to all the benefits and subject to all the burdens and disadvantages of the contracts. The buyer could not, of course, resell for more than the Reclamation Bureau appraised value within five years after the water for irrigation became available to the land."[5]

The Government's argument here is that its motion for a directed verdict should have been granted and that the instruction just quoted is erroneous. It says that appellee "cannot have sold his land for more than $1,353.01. That amount therefore, was market value"; further, that an award for a greater amount would give appellee more than the land was worth.

It is apparent that the owner's prospect of selling his land was only one element going to make up the value which must be considered here. The real question is, what is the "just compensation" to which he is entitled? It is true that the right to sell has been so strictly limited that actually a sale within the five years is most unlikely. But there was no restriction upon the use which the owner might make of the land. That use was not confined to the land as raw land. At the date of taking, March 15, 1951, the owner could expect its use as irrigated land in 1954 and thereafter.[6]

4. The Judge also remarked: "I can't escape the feeling Mr. Douglas and those in his situation has a value there that should be considered there over and above the appraised value put upon it by the Reclamation Bureau as raw land. Suppose that Mr. Douglas's situation under these contracts was that he could never resell this land for more than a dollar an acre, but he and his heirs could keep it and use it. Is he to be deprived of the valuable right of use, his life expectancy and his heirs after him, is he to be deprived of that use simply because if he sold it he could only get a dollar an acre? I don't think that would be fair where he has the right to keep it, and I assume these contracts don't apply to involuntary sale, or a passing by will or inheritance."

5. Compare the court's "theoretical buyer" and "theoretical seller" with Orgel's "hypothetical vendors and vendees", as quoted in Westchester County Park Commission v. United States, infra [143 F.2d 692].

6. Any increment of value due to the expected irrigation came from the Colum-

This fact cannot be ignored if the court is to fix just compensation in relation to "value in view of all available uses",[7] or its value for the "most advantageous uses to which it may be applied." [8]

 It is true that ordinarily value is arrived at by a determination of "market value", or of "fair market value". But there are exceptional cases in which market value could not be used as a test of "just compensation".[9] As stated in United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336, "Where, for any reason, property has no market resort must be had to other data to ascertain its value; * * *."

 We think that the correct principle to be applied here is that stated in Westchester County Parks Commission v. United States, 2 Cir., 143 F.2d 688. In that case the land taken was owned by the County and under the supervision and control of the County Park Commissioner. At the time of the taking the County lacked any power or authority to sell the land. However, the court said, 143 F.2d at page 692: "Nor is it relevant that the County, without authorization by the State, could not sell; we must regard the situation as if it could, as if the property were being voluntarily sold by a seller free to do so." And in discussing the applica-

tion of the concept of market value to a situation of that kind, Judge Frank, speaking for the court, used language which we think is particularly applicable here. He said 143 F.2d at pages 691–692: "Under the Fifth Amendment, the owner of land taken by condemnation is entitled to 'just compensation.' The key notion is indemnity, measured in money, for the owner's loss of the condemned property. In an effort to definitize this notion, it has been said that it requires the payment of a sum equal to the 'value' of the property taken. But if 'just compensation' is a baffling indefinite concept, 'value' is no less so. To mouth it is not to answer but to ask a question. In the condemnation cases, the courts, trying to contrive a practical standard, have adopted the concept of 'market value', i. e., what it fairly may be believed a willing buyer (one not forced to buy) would, in fair market conditions, have given to a willing seller (one not forced to sell). As Orgel suggests, 'The reference is not to actual buyers and sellers, but to hypothetical vendors and vendees of a vaguely described state of mind, and these phantom personalities constitute perhaps the most puzzling element in any attempted elucidation of the Court's concept of "fair market value" * * * The concept * * *, like the standards of reasonableness that are common

bia Basin Project, not from the Atomic Energy project under which condemnation was sought. Hence there is here no problem of increment of value "due to the initiation of the project" such as was considered in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 279.

7. See Orgel, "Valuation Under Eminent Domain", § 30. Cf. Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236: "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered * * *."

8. Boom Co. v. Patterson, 8 Otto 403, 98 U.S. 403, 408, 410, 25 L.Ed. 206. Cf. U. S. v. Chandler-Dunbar Co., 229 U.S. 53, 77, 33 S.Ct. 667, 57 L.Ed. 1063; Weiser Valley Land & Water Co. v. Ryan, 9 Cir., 190 F. 417.

9. "Ordinarily, where the value of lands or goods is to be ascertained, and they are of such a kind, and so situated, as to be available for sale in the ordinary course of trade or dealing, the market value is perhaps the best test, and under such circumstances it is usually adopted in this Commonwealth. * * * But market value is not a universal test, and cases often arise where some other mode of ascertaining value must be resorted to." Beale v. Boston, 166 Mass. 53, 55, 43 N.E. 1029, 1030. In accord see United States v. Toronto, Hamilton & Buffalo Nav. Co., 338 U.S. 396, 402, 70 S.Ct. 217, 94 L.Ed. 195; Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765. Cf. Orgel, supra, § 17.

in other branches of the law, * * * derives a large measure of its usefulness from this very vagueness, for it enables the court to adjust the rigid rules of law to the requirements of justice and indemnity in each particular case.' "

The Government cites United States v. Commodities Trading Corp., 339 U.S. 121, 70 S.Ct. 547, 551, 94 L.Ed. 707, in support of its position. We think that that case presents a different situation than that which is now before us. In that case the pepper which was requisitioned by the War Department was taken at a time when that commodity was subject to an OPA ceiling price. In disapproving the action of the Court of Claims in fixing just compensation at a figure above the prevailing ceiling price, the Supreme Court disapproved the so-called "right to hold" the property in anticipation of future rises in prices on the basis of which the Court of Claims had considered that the pepper had a "retention value" over and above its current market value. The court in so disapproving the recognition of such a value pointed to the "highly speculative nature" of the proof that would be required to show possible future prices, stating that predictions as to how long the price fixing legislation might continue, would be "guesses" and "not informed forecasts." Not only was the court influenced by the speculative character of the claimed value, but it noted that only a limited few could take advantage of the Court of Claims rule, and that the recognition of such a rule would put a premium on "recalcitrance in time of war." It alluded to the means adopted by Congress for procuring assurance that the prices fixed would be "generally fair and equitable", including provision for judicial review of the price regulations. It seems plain that in the Commodities Corp. case, the merchandise there involved was generally and currently being bought and sold upon a market which conformed to the ceiling prices, but the prices paid were market prices nevertheless.

Here we think it cannot be said that the appraised value of this land was its market value in the legal sense. The provision in the required contract that Douglas could not sell for more than the raw land value was one which the Government had exacted in its effort to confine the benefits of the reclamation project to the actual settlers and to prevent those benefits from getting into the hands of speculators. But when Douglas signed such a contract it created a limitation on sale which was personal to him. It had nothing whatever to do with what a willing buyer might have offered. As a practical matter, this restriction against his sale, resembled those restrictions which would have prevented sale by him if he were an infant or otherwise incompetent.

That this contract limitation upon Douglas was not in fact a limitation upon the market is apparent from evidence disclosed at the trial. It was shown that the State of Washington owned certain tracts, constituting a part of the Sections 16 and 36 included in the land grant to the State, which were farm units under the project. The State had not undertaken any such limitation upon its sales as had Douglas, and it was proven that reasonably near to the time of the taking of the Douglas tract, the State had held auction sales of these project units and upon such sales the purchasers had bid as high as $100 per acre. In each case, the purchaser was informed that he would be required, as a condition of water delivery, to execute the same kind of recordable contract limiting sales as that executed by Douglas. It was the testimony of the Reclamation Bureau's Chief Economist for this project that the public was very eager to buy such farm units. He described the demand for them by saying: "We get about 3000 applications for every farm unit we have out there."

We think that the views expressed and the instructions given by the district court were correct. It cannot be said in the circumstances here

that the limitation represented by the sum referred to in Douglas's contract was either a market value or a sum consistent with the "just compensation" requirements of such cases. Accordingly the judgment is affirmed.