**PEWEE COAL COMPANY, Incorporated,**
v.
**UNITED STATES.**
Nos. 49351, 50140.

United States Court of Claims.
June 4, 1958.

Lewis W. Evans, Washington, D. C., for plaintiff. Samuel T. Ansell, Jr., and Ansell & Ansell, Washington, D. C., were on the brief.

William A. Stern, II, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

PER CURIAM.

The Trial Commissioner, Mastin G. White, to whom these cases were referred, has submitted an opinion in support of his recommendation for the conclusion of law to be entered in these cases, which, in the main, we adopt as the opinion of the court. His opinion, as amended by us, follows:

These cases arose under the clause in the Fifth Amendment to the Constitution of the United States which provides as follows:

"* * * nor shall private property be taken for public use, without just compensation."

A joint trial was conducted with the consent of the parties.

The plaintiff has been engaged in the business of mining and marketing bituminous coal for a number of years. In carrying on this business, it is the lessee of approximately 1,465 acres of coal-

bearing lands located in a mountainous section of Campbell County, Tennessee. The leased area consists of three tracts of land. Two of the tracts, aggregating approximately 1,149 acres, are owned by the Coal Creek Mining & Manufacturing Company. The third tract, which is situated between the other two tracts and adjoins each of them, includes approximately 316 acres and is owned by the East Tennessee Iron & Coal Company.

The three tracts of land mentioned in the preceding paragraph are held by the plaintiff under a lease which the landowners jointly issued to the plaintiff on November 28, 1939. The lease is for a term of 40 years, and it grants the plaintiff an option to renew it for an additional period of 30 years upon the expiration of the primary 40-year term. Under the lease, the plaintiff has the exclusive right to mine coal from the seams lying above a specified depth in the leased lands. The plaintiff is required by the lease to pay the lessors a royalty of 10 cents per ton on the coal produced under the lease, payment on a minimum production of 100,000 tons per year being guaranteed. The lease prohibits the plaintiff from assigning or transferring it, or from subletting the leased property, without the written consent of both lessors.

The plaintiff opened a coal mine on the leased lands, and began the production of coal from the mine in January 1941. Although the quality, quantity, and availability of the coal made the plaintiff's leasehold potentially valuable, the plaintiff's mining operations were conducted at a financial loss each year down to and including the year 1949 (that being the last year as to which there is evidence in the record concerning the plaintiff's profit or loss experience). These losses were due principally to inadequate equipment and other causes.

On November 1, 1943, on April 10, 1945, and again on May 22, 1946, there were widespread labor difficulties and strikes at the bituminous coal mines of the country. The plaintiff's mine was among those affected by the strikes and resulting work stoppages, which, in the first two instances, threatened the national security (as the Nation was then engaged in the prosecution of World War II) and, in the third instance, threatened the national economy during the period of postwar conversion from war to peace.

On each of the dates mentioned in the preceding paragraph, the President issued an Executive order authorizing and directing the Secretary of the Interior to take "possession" of any and all coal mines affected by the strikes and to operate or arrange for the operation of such mines. Each Executive order declared (among other things) that the Secretary should permit the existing managers of the mines to continue their "managerial functions to the maximum degree possible consistent with the aims of this order". Executive Order 9393 (8 F.R. 14877), U.S.Code Cong.Service 1943, p. 5.90; Executive Order 9536 (10 F.R. 3939), U.S.Code Cong.Service 1945, p. 1227; Executive Order 9728 (11 F.R. 5593), U.S.Code Cong.Service 1946, p. 1803.

The Secretary of the Interior took action under each of the Executive orders mentioned above by issuing on the same day an order declaring (among other things) that "I * * * take possession of each and all of such coal mines", that "The President of each of the mining companies * * * is hereby, and until further notice, designated operating manager for the United States for each" mine affected by the order, and that "As operating manager for the United States, he is authorized and directed * * * to do all things necessary and appropriate for the operation of such mines and for the production, distribution and sale of their products". Order No. 1888 (8 F.R. 15199); Order No. 2044 (10 F.R. 3983); Order No. 2200 (11 F.R. 5603).

The plaintiff's mine was one of those covered by the Secretarial orders referred to above. Possession (in a technical sense) of the plaintiff's mine under

the first of these orders continued from November 1, 1943 until June 21, 1944, inclusive; possession under the second order continued from April 10, 1945 until June 13, 1945, inclusive; and possession under the third order continued from May 22, 1946 until June 30, 1947, inclusive.

Because of the actions of the Government in taking possession of the plaintiff's mine on the occasions mentioned above, the strikes and work stoppages which had previously existed at the plaintiff's mine came to an end, and mining operations were conducted at the mine during the periods of possession by the Government under the several Secretarial orders (except that the mine was shut down for approximately five months during the third period because of a fire).

As provided in the respective Executive and Secretarial orders, the plaintiff's president acted as operating manager of the plaintiff's mine for the United States during the three periods with which we are concerned. Except for directives from the Government requiring that the flag of the United States be flown at the mine, that a notice relative to Government possession be displayed conspicuously at the mine, and that certain additional "fringe" benefits be provided for the plaintiff's employees during the first and third periods, the Government left the plaintiff's president free, generally speaking, to exercise his discretion in the conduct of the plaintiff's affairs during the periods of Government possession of the mine.

The additional "fringe" benefits which the plaintiff was required by the Government to provide for its employees increased the plaintiff's costs in the amount of $1,080 during the first period of Government possession, and in the amount of $3,065.48 during the third period of Government possession, or in the total amount of $4,145.48.

The plaintiff's consistent history of financial losses continued during the three periods of Government possession of the plaintiff's mine that are involved in the present litigation. During the period November 1, 1943–June 21, 1944, the plaintiff suffered a net financial loss in the amount of $4,365.14. The plaintiff's net loss amounted to $3,077.14 during the period April 10, 1945–June 13, 1945. Finally, the plaintiff suffered a net financial loss of $64,298.02 during the period May 22, 1946–June 30, 1947. (As previously stated, the mine was shut down for approximately five months during the third period because of a fire.) Therefore, the plaintiff's aggregate loss during the three periods with which we are concerned amounted to $71,740.30.

There are two cases before the court. In case No. 49351, the plaintiff seeks a judgment with respect to the period November 1, 1943–June 21, 1944. Case No. 50140 covers the periods April 10, 1945–June 13, 1945 and May 22, 1946–June 30, 1947.

█ It is settled law that a leasehold is "property" and, accordingly, that if realty under lease is taken by the Government for public use, just compensation must be paid to the leaseholder. United States v. Petty Motor Co., 1946, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729.

█ Moreover, it is plain that the degree of control which the Government exercised or could have exercised over the plaintiff's mine during the three periods with which we are concerned amounted to a "taking" of the plaintiff's mine for public use. With regard to this point, the facts in the two present cases are similar in all substantial respects to the facts in the earlier case of Pewee Coal Co., Inc., v. United States, 1950, 88 F.Supp. 426, 115 Ct.Cl. 626, affirmed 1951, 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809. The several cases merely involve different periods during which the Government was in possession (at least technically) of the plaintiff's mine for the purpose of ending strikes and restoring the production of coal in the national interest. Therefore, the unanimous view of the members of the Supreme Court in the first Pewee case, 341 U.S. at pages 115, 119, 121, 71 S.Ct. at

pages 671, 672, 674, that there had been a "taking" of the plaintiff's mine for the period that was involved in that case (May 1–October 12, 1943) is determinative of the question whether there was a "taking" of the plaintiff's mine for the subsequent periods that are involved in the present litigation.

That leaves for determination in the present cases the problem of "just compensation".

■ In the absence of any definition of "just compensation" in the Constitution, the courts have adopted and applied the principle that just compensation is the value of the interest taken. The term "value" is ordinarily used in the sense of "market value" or "fair market value", i. e., "market value fairly determined". United States v. Miller, 1943, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336; General Motors Corporation v. United States, 1945, 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311; United States v. Petty Motor Co., supra, 327 U.S. at page 377, 66 S.Ct. at page 281; United States v. Douglas, 207 F.2d 381, 384, certiorari denied 347 U.S. 920, 74 S.Ct. 520, 98 L.Ed. 1074. Therefore, in the ordinary case arising from a temporary taking of real property by the Government, the proper measure of compensation is the rental that could probably have been obtained for the use of the property during the period involved in the case. Kimball Laundry Co. v. United States, 1949, 338 U.S. 1, 7, 69 S.Ct. 1434, 93 L.Ed. 1765.

The standard of market rental value cannot, however, be utilized in the present cases. The evidence fails to show that the plaintiff's mine would have been rentable for any of the three periods involved in these cases if the defendant had not taken and retained possession of the mine during such periods. On the contrary, the inference is warranted that the plaintiff's mine would not have been rentable for any of these periods.

In the first place, the mine was affected by a strike and work stoppage prior to and at the time of each seizure of the mine by the Government, and it seems likely that the strike and work stoppage would have continued throughout each of the periods but for the actions of the Government in seizing the mine and taking the other steps that led to the resumption of mining operations. It is difficult to imagine that any prospective sublessee would have been interested in renting the plaintiff's mine on a short-term basis under such circumstances.

Secondly, the plaintiff's mine was in need of extensive, time-consuming, and expensive rehabilitation before there could have been any reasonable expectation of being able to operate it at a profit. Any prospective sublessee would have required the security of a long-term sublease before undertaking the necessary rehabilitation work at the plaintiff's mine. Obviously, such a rehabilitation program would not have been feasible during the relatively short periods of time that are involved in the present cases.

Furthermore, there is no evidence in the record to indicate that the consent of both of the plaintiff's lessors to the subleasing of the mine for the three periods could have been obtained. As previously indicated, such dual consent was a prerequisite in order for the plaintiff to sublet its mine or to assign its lease.

The record does contain evidence indicating that in the 1940's there were persons who, if they could have subleased the plaintiff's mine on a long-term basis (e. g., for the remainder of the time covered by the plaintiff's lease), would have been willing to pay a royalty of 35 cents per ton on the coal produced from the mine. However, there is no indication in the evidence that the consent of both of the plaintiff's lessors to such a sublease could have been obtained; or, assuming that the dual consent of the plaintiff's lessors to such a sublease could have been obtained, the evidence fails to show what portion of the 35-cent royalty the plaintiff's lessors would have demanded for themselves as a condition precedent to giving their consent and what portion, if any, they would have

been willing to permit the plaintiff to receive in the nature of an overriding royalty.

The available evidence does not assist us in determining the rental value of the plaintiff's mine under the circumstances and for the periods involved in this litigation.

■ The fact that the standard of market rental value cannot be utilized in the present cases does not necessarily mean that the decision must be unfavorable to the plaintiff. Where, for any reason, property taken by the Government has no market, it is necessary to utilize other data in order to ascertain its value for the purpose of awarding "just compensation". United States v. Miller, supra, 317 U.S. at page 374, 63 S.Ct. at page 280; Kimball Laundry Co. v. United States, supra, 338 U.S. at page 6, 69 S.Ct. at page 1438.

In the first Pewee case, previously cited, the plaintiff failed to prove the rental value of its mine for the period of Government possession involved in that case. However, the evidence did establish that the plaintiff's financial loss during such period amounted to $36,128.96, and that the plaintiff expended the sum of $2,241.26 in complying with directives issued by the Government. The Court of Claims decided (with one judge dissenting) that the plaintiff was entitled to recover the $2,241.26 representing the extra expense of operation occasioned by the Government. The Government applied for a writ of certiorari, which was granted by the Supreme Court.

In the Supreme Court, five members of the Court agreed that the decision of the Court of Claims should be affirmed, and that was done. Four of the five Supreme Court justices who concurred in the affirmance of the decision below would have been willing to go further, for they joined in an opinion which stated that the plaintiff was actually entitled to recover the total operating loss of $36,128.96. On the other hand, four members of the Court joined in a dissenting opinion to the effect that the plaintiff was not entitled to recover anything, since there was no showing (in the view of the dissenters) that the Government had subjected the company to any pecuniary loss.

The five justices in the majority opinion agreed on a judgment in plaintiff's favor in the amount by which plaintiff's losses from operation were increased by compliance with the Government's directive to pay its employees certain "fringe" benefits.

■ That is the law which controls this case. The amount expended by plaintiff in case No. 49351 in complying with the Government's directives was $1,080, and in case No. 50140 was $3,065.48.

Defendant, however, says plaintiff is not entitled to recover anything in either case, for this additional reason:

After the May 1–October 12, 1943 seizure of the plaintiff's mine by the Government had ended, an agreement was made between the plaintiff, on the one hand, and Frank Garland, Lindsay Young, Will Davis, and the Garland Coal Company (of which Frank Garland was president), on the other hand, whereby claims in the aggregate amount of $50,761.11 which the members of the Garland group held against the plaintiff were settled in exchange for a promise by the plaintiff to pay over to the members of the Garland group, in the ratio of their several claims against the plaintiff, all funds that might be recovered by the plaintiff upon its claim against the Government arising from the May 1–October 12, 1943 seizure of the plaintiff's mine. The plaintiff's claim against the Government mentioned in the preceding sentence was subsequently litigated, and, as indicated in an earlier part of this opinion, the plaintiff recovered $2,241.26 on that claim. Presumably, this amount was paid over by the plaintiff to the members of the Garland group in proportionate shares.

The settlement agreement between the plaintiff and the Garland group only pur-

ported to transfer to the Garland group the beneficial interest in the plaintiff's claim against the Government growing out of the May 1–October 12, 1943 seizure of the plaintiff's mine. However, with the occurrence of the later seizures that are involved in the present litigation, all the persons involved in the settlement agreement treated it as transferring to the Garland group the beneficial interests in all of the plaintiff's claims against the Government growing out of the subsequent seizures.

For example, Mr. Garland employed counsel and instituted in the plaintiff's name case No. 49351 relative to the November 1, 1943–June 21, 1944 seizure without securing any authorization from the plaintiff. After the suit was filed, the plaintiff's principal officer wrote to Mr. Garland on February 28, 1950 a letter stating that:

" * * * I hereby agree, on behalf of myself and the Pewee Coal Company, to prosecute this additional claim against the United States of America, all expenses to be borne by you, and to turn over to you any recovery realized therefrom * *."

Then on May 4, 1951, the plaintiff informed Mr. Garland in writing that:

" * * * Pewee Coal Company hereby agrees to prosecute any suit or suits against the United States of America, based on seizure of the Company's properties by the Government during the period * * * which commenced June 10, 1940 and ended on or about November 22, 1947, which your attorney deems necessary to file in order to protect your interests, and to turn over to you the proceeds of any recovery or recoveries realized therefrom; provided that all expenses of such suit or suits are to be borne by you."

Some five days after this communication was written, Mr. Garland, through counsel employed by him, instituted in the name of the plaintiff case No. 50140 relative to the April 10, 1945–June 13, 1945 and the May 22, 1946–June 30, 1947 seizures.

All the proceedings in cases numbered 49351 and 50140 have been conducted by counsel employed by Mr. Garland for such purposes.

The defendant contends in its brief that the plaintiff does not have any interest in the present litigation, that the statements in the pending petitions to the effect that the plaintiff is the sole owner of the claims asserted in the petitions and has not assigned any part of such claims are false, and, therefore, that the petitions should be dismissed.

■ A false statement in a petition before this court to the effect that there has been no assignment of the claim sued upon can, under some circumstances, form the basis of a plea in fraud by the Government. Globe Works v. United States, 1910, 45 Ct.Cl. 497, 504–505. In the present litigation, however, the defendant's brief specifically disclaims any charge of fraud respecting the matters now under discussion. Consequently, we do not have for consideration the applicability to these cases of 28 U.S.C. § 2514, which declares in part that:

"A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof."

The sanction of forfeiture under this statutory provision is harsh, and it can be invoked only when the Government assumes the burden of pleading and proving that a claimant has corruptly practiced or attempted to practice fraud against the United States in the proof, statement, establishment, or allowance of his claim. Globe Works v. United States, supra, at page 508. That has not been done in the present cases.

We turn, then, to Rule 20(a) of the rules of this court, 28 U.S.C., which appears to be the principal basis for the

defendant's argument on the point now under discussion. Rule 20(a) provides in pertinent part as follows:

"Every action shall be prosecuted in the name of the real party in interest * * *."

■ The question arises, therefore, as to who is "the real party in interest" in the present litigation.

When the plaintiff's mine was temporarily taken and retained by the defendant for the periods November 1, 1943–June 21, 1944, April 10, 1945–June 13, 1945, and May 22, 1946–June 30, 1947, there arose in favor of the plaintiff claims for just compensation under the Fifth Amendment. Although the plaintiff and the Garland group have apparently proceeded on the assumption that the beneficial interests in these claims passed to the Garland group, that assumption is incorrect. Even if the letters dated February 28, 1950 and May 4, 1951 are to be construed as purporting to assign the plaintiff's claims, or interests in the claims, to the Garland group, such attempted assignments are null and void.

With exceptions not material to these cases, Section 3477 of the Revised Statutes, as amended (31 U.S.C.A. § 203), provides that:

"All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, * * * and all * * * orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, * * * shall be absolutely null and void * * *."

This language could hardly be more explicit or comprehensive. Spofford v. Kirk, 1878, 97 U.S. 484, 488, 24 L.Ed. 1032. It plainly deprives the letters dated February 28, 1950 and May 4, 1951 of any legal effect and leaves with the plaintiff its claims for just compensation growing out of the three mine seizures that are involved in the present litigation. Hence, the plaintiff is "the real party in interest" in these cases.

■ Of course, we have the unusual situation of the plaintiff merely acquiescing in the prosecution of the present suits in its name by counsel employed by someone else, who is bearing the costs of the litigation in the hope and with the expectation that the plaintiff will pay over to him and his associates the proceeds of the litigation, because of the past history previously related. Such a situation is not in accord with the principles of the orderly administration of justice. See Severin v. United States, 1943, 99 Ct.Cl. 435, 444, certiorari denied 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567. However, in the absence of an allegation of fraud by the defendant and adequate proof supporting the allegation, this is not sufficient to warrant the dismissal of the petitions.

Judgment will be entered in plaintiff's favor in case No. 49351 in the amount of $1,080, and in case No. 50140, in the amount of $3,065.48, plus interest at four (4) percent per annum on $1,080.00 in case No. 49351 from June 21, 1944 to date of payment, and on $3,065.48 in case No. 50140 from June 30, 1947 to date of payment.

It is so ordered.

JONES, Chief Judge, took no part in the consideration and decision of these cases.