Opinion

per curiam:

The trial commissioner, Mastín G. White, to whom these cases were referred, has submitted an opinion in support of his recommendation for the conclusion of law to be entered in these cases, which, in the main, we adopt as the opinion of the court. His opinion, as amended by us, follows:
These cases arose under the clause in the Fifth Amendment to the Constitution of the United States which provides as follows:
*798 * * * nor shall private property be taken for public use, without just compensation.
A joint trial was conducted with the consent of the parties.
The plaintiff has been engaged in the business of mining and marketing bituminous coal for a number of years. In carrying on this business, it is the lessee of approximately 1,465 acres of coal-bearing lands located in a mountainous section of Campbell County, Tennessee. The leased area consists of three tracts of land. Two of the tracts, aggregating approximately 1,149 acres, are owned by the Coal Creek Mining & Manufacturing Company. The third tract, which is situated between the other two tracts and adjoins each of them, includes approximately 316 acres and is owned by the East Tennessee Iron & Coal Company.
The three tracts of land mentioned in the preceding paragraph are held by the plaintiff under a lease which the landowners jointly issued to the plaintiff on November 28, 1939. The lease is for a term of 40 years, and it grants the plaintiff an option to renew it for an additional period of 30 years upon the expiration of the primary 40-year term. Under the lease, the plaintiff has the exclusive right to mine coal from the seams lying above a specified depth in the leased lands. The plaintiff is required by the lease to pay the lessors a royalty of 10 cents per ton on the coal produced under the lease, payment on a minimum production of 100,000 tons per year being guaranteed. The lease prohibits the plaintiff from assigning or transferring it, or from subletting the leased property, without the written consent of both lessors.
The plaintiff opened a coal mine on the leased lands, and began the production of coal from the mine in January 1941. Although the quality, quantity, and availability of the coal made the plaintiff’s leasehold potentially valuable, the plaintiff’s mining operations were conducted at a financial loss each year down to and including the year 1949 (that being the last year as to which there is evidence in the record concerning the plaintiff’s profit or loss experience). These losses were due principally to inadequate equipment and other causes.
*799 On November 1, 1943, on April 10, 1945, and again on May 22, 1946, there were widespread labor difficulties and strikes at the bituminous coal mines of the country. The plaintiff’s mine was among those affected by the strikes and resulting work stoppages, which, in the first two instances, threatened the national security (as the Nation was then engaged in the prosecution of World War II) and, in the third instance, threatened the national economy during the period of postwar conversion from war to peace.
On each of the dates mentioned in the preceding paragraph, the President issued an Executive order authorizing and directing the Secretary of the Interior to take “possession” of any and all coal mines affected by the strikes and to operate or arrange for the operation of such mines. Each Executive order declared (among other things) that the Secretary should permit the existing managers of the mines to continue their “managerial functions to the maximum degree possible consistent with the aims of this order”. Executive Order 9393 (8 F. R. 14877); Executive Order 9536 (10 F. R. 3939); Executive Order 9728 (11 F. R. 5593).
The Secretary of the Interior took action under each of the Executive orders mentioned above by issuing on the same day an order declaring (among other things) that “I * * * take possession of each and all of such coal mines”, that “The President of each' of the mining companies * * * is hereby, and until further notice, designated operating manager for the United States for each” mine affected by the order, and that “As operating manager for the United States, he is authorized and directed * * * to do all things necessary and appropriate for the operation of such mines and for the production, distribution and sale of their products”. Order No. 1888 (8 F. R. 15199); Order No. 2044 (10 F. R. 3983); Order No. 2200 (11 F. R. 5603).
The plaintiff’s mine was one of those covered by the-Secretarial orders referred to above. Possession (in a technical sense) of the plaintiff’s mine under the first of these orders continued from November 1,1943 until June 21,1944, inclusive; possession under the second order, continued from April 10, 1945 until June 13,1945, inclusive; and possession *800 under the third order continued from May 22, 1946 until June 30,1947, inclusive.
Because of the actions of the Government in taking possession of the plaintiff’s mine on the occasions mentioned above, the strikes and work stoppages which had previously existed at the plaintiff’s mine came to an end, and mining operations were conducted at the mine during the periods of possession by the Government under the several Secretarial orders (except that the mine was shut down for approximately five months during the third period because of a fire).
As provided in the respective Executive and Secretarial orders, the plaintiff’s president acted as operating manager of the plaintiff’s mine for the United States during the three periods with which we are concerned. Except for directives from the Government requiring that the flag of the United States be flown at the mine, that a notice relative to Government possession be displayed conspicuously at the mine, and that certain additional “fringe” benefits be provided for the plaintiff’s employees during the first and third periods, the Government left the plaintiff’s president free, generally speaking, to exercise his discretion in the conduct of the plaintiff’s affairs during the periods of Government possession of the mine.
The additional “fringe” benefits which the plaintiff was required by the Government to provide for its employees increased the plaintiff’s costs in the amount of $1,080 during the first period of Government possession, and in the amount of $3,065.48 during the third period of Government possession, or in the total amount of $4,145.48.
The plaintiff’s consistent history of financial losses continued during the three periods of Government possession of the plaintiff’s mine that are involved in the present litigation. During the period November 1,1943-June 21,1944, the plaintiff suffered a net financial loss in the amount of $4,365.14. The plaintiff’s net loss amounted to $3,077.14 during the period April 10, 1945-June 13, 1945. Finally, the plaintiff suffered a net financial loss of $64,298.02 during the period May 22, 1946-June 30, 1947. (As previously stated, the mine was shut down for approxi *801 mately five months during the third period because of a fire.) Therefore, the plaintiff’s aggregate loss during the three periods with which we are concerned amounted to $71,740.30.
There are two cases before the court. In case No. 49351, the plaintiff seeks a judgment with respect to the period November 1, 1943-June 21,1944. Case No. 50140 covers the periods April 10, 1945-June 13, 1945 and May 22, 1946-June 30, 1947.
It is settled law that a leasehold is “property” and, accordingly, that if realty under lease is taken by the Government for public use, just compensation must be paid to the leaseholder. United States v. Petty Motor Co., 327 U. S. 372 (1946).
Moreover, it is plain that the degree of control which the Government exercised or could have exercised over the plaintiff’s mine during the three periods with which we are concerned amounted to a “taking” of the plaintiff’s mine for public use. With regard to this point, the facts in the two present cases are similar in all substantial respects to the facts in the earlier case of Pewee Coal Co., Inc. v. United States, 115 C. Cls. 626 (1950), affirmed 341 U. S. 114 (1951). The several cases merely involve different periods during which the Government was in possession (at least technically) of the plaintiff’s mine for the purpose of ending strikes and restoring the production of coal in the national interest. Therefore, the unanimous view of the members of the Supreme Court in the first Pewee case (341 U. S. at pp. 115, 119, 121) that there had been a “taking” of the plaintiff’s mine for the period that was involved in that case (May 1-October 12,1943) is determinative of the question whether there was a “taking” of the plaintiff’s mine for the subsequent periods that are involved in the present litigation.
That leaves for determination in the present cases the problem of “just compensation”.
In the absence of any definition of “just compensation” in the Constitution, the courts have adopted and applied the principle that just compensation is the value of the interest taken. The term “value” is ordinarily used in the *802 sense of “market value” or “fair market value”, i. e., “market value fairly determined”. United States v. Miller, 317 U. S. 369, 374 (1943); General Motors Corporation v. United States, 323 U. S. 373, 379 (1945); United States v. Petty Motor Co., supra, at p. 377; United States v. Douglas, 207 F. 2d 381, 384 (C. A. 9, 1953), cert. denied 347 U. S. 920. Therefore, in the ordinary case arising from a temporary taking of real property by the Government, the proper measure of compensation is the rental that could probably have been obtained for the use of the property during the period involved in the case. Kimball Laundry Co. v. United States, 338 U. S. 1, 7 (1949).
The standard of market rental value cannot, however, be utilized in the present cases. The evidence fails to show that the plaintiff’s mine would have been rentable for any of the three periods involved in these cases if the defendant had not taken and retained possession of the mine during such periods. On the contrary, the inference is warranted that the plaintiff’s mine would not have been rentable for any of these periods.
In the first place, the mine was affected by a strike and work stoppage prior to and at the time of each seizure of the mine by the Government, and it seems likely that the strike and work stoppage would have continued throughout each of the periods but for the actions of the Government in seizing the mine and taking the other steps that led to the resumption of mining operations. It is difficult to imagine that any prospective sublessee would have been interested in renting the plaintiff’s mine on a short-term basis under such circumstances.
Secondly, the plaintiff’s mine was in need of extensive, time-consuming, and expensive rehabilitation before there could have been any reasonable expectation of being able to operate it at a profit. Any prospective sublessee would have required the security of a long-term sublease before undertaking the necessary rehabilitation work at the plaintiff’s mine. Obviously, such a rehabilitation program would not have been feasible during the relatively short periods of time that are involved in the present cases.
*803 Furthermore, there is no evidence in the record to indicate that the consent of both of the plaintiff’s lessors to the subleasing of the mine for the three periods could have been obtained. As previously indicated, such dual consent was a prerequisite in order for the plaintiff to sublet its mine or to assign its lease.
The record does contain evidence indicating that in the 1940’s there were persons who, if they could have subleased the plaintiff’s mine on a long-term basis (e. g., for the remainder of the time covered by the plaintiff’s lease), would have been willing to pay a royalty of 35 cents per ton on the coal produced from the mine. However, there is no indication in the evidence that the consent of both of the plaintiff’s lessors to such a sublease could have been obtained; or, assuming that the dual consent of the plaintiff’s lessors to such a sublease could have been obtained, the evidence fails to show what portion of the 35-cent royalty the plaintiff’s lessors would have demanded for themselves as a condition precedent to giving their consent and what portion, if any, they wordd have been willing to permit the plaintiff to receive in the nature of an overriding royalty.
The available evidence does not assist us in determining the rental value of the plaintiff’s mine under the circumstances and for the periods involved in this litigation.
The fact that the standard of market rental value cannot be utilized in the present cases does not necessarily mean that the decision must be unfavorable to the plaintiff. Where, for any reason, property taken by the Government has no market, it is necessary to utilize other data in order to ascertain its value for the purpose of awarding “just compensation”. United States v. Miller, supra, at p. 374; Kimball Laundry Co. v. United States, supra, at p. 6.
In the first Pewee case, previously cited, the plaintiff failed to prove the rental value of its mine for the period of Government possession involved in that case. However, the evidence did establish that the plaintiff’s financial loss during such period amounted to $36,128.96, and that the plaintiff expended the sum of $2,241.26 in complying with directives issued by the Government. The Court of Claims de *804 cided (with one judge dissenting) that the plaintiff was entitled to recover the $2,241.26 representing the extra expense of operation occasioned by the Government. The Government applied for a writ of certiorari, which was granted by the Supreme Court.
In the Supreme Court, five members of the Court agreed that the decision of the Court of Claims should be affirmed, and that was done. Four of the five Supreme Court justices who concurred in the affirmance of the decision below would have been willing to go further, for they joined in an opinion which stated that the plaintiff was actually entitled to recover the total operating loss of $36,128.96. On the other hand, four members of the Court joined in a dissenting opinion to the effect that the plaintiff was not entitled to recover anything, since there was no showing (in the view of the dissenters) that the Government had subjected the company to any pecuniary loss.
The five justices in the majority opinion agreed on a judgment in plaintiff’s favor in the amount by which plaintiff’s losses from operation were increased by compliance with the Government’s directive to pay its employees certain “fringe” benefits.
That is the law which controls this case. The amount expended by plaintiff in case No. 49351 in complying with the Government’s directives was $1,080, and in case No. 50140 was $3,065.48.
Defendant, however, says plaintiff is not entitled to recover anything in either case, for this additional reason:
After the May 1-October 12,1943 seizure of the plaintiff’s mine by the Government had ended, an agreement was made between the plaintiff, on the one hand, and Frank Garland, Lindsay Young, Will Davis, and the Garland Coal Company (of which Frank Garland was president), on the other hand, whereby claims in the aggregate amount of $50,761.11 which the members of the Garland group held against the plaintiff were settled in exchange for a promise by the plaintiff to pay over to the members of the Garland group, in the ratio of their several claims against the plaintiff, !all funds that might be recovered by the plaintiff upon its claim against the Government arising from the May 1-October 12,1943 seizure *805 of the plaintiff’s mine. The plaintiff’s claim 'against the Government mentioned in the preceding sentence was subsequently litigated, and, as indicated in an earlier part of this opinion, the plaintiff recovered $2,241.26 on that claim. Presumably, this amount was paid over by the plaintiff to the members of the Garland group in proportionate shares.
The settlement agreement between the plaintiff and the Garland group only purported to transfer to the Garland group the beneficial interest in the plaintiff’s claim against the Government growing out of the May 1-October 12, 1948 seizure of the plaintiff’s mine. However, with the occurrence of the later seizures that are involved in the present litigation, all the persons involved in the settlement agreement treated it as transferring to the Garland group the beneficial interests in all of the plaintiff’s claims against the Government growing out of the subsequent seizures.
For example, Mr. Garland employed counsel and instituted in the plaintiff’s name case No. 49351 relative to the November 1, 1943-June 21, 1944 seizure without securing any authorization from the plaintiff. After the suit was filed, the plaintiff’s principal officer wrote to Mr. Garland on February 28,1950 a letter stating that:
* * * I hereby agree, on behalf of myself and the Pewee Coal Company, to prosecute this additional claim against the United States of America, all expenses to be borne by you, and to turn over to you any recovery realized therefrom * * *.
Then on May 4, 1951, the plaintiff informed Mr. Garland in writing that:
* * * Pewee Coal Company hereby agrees to prosecute any suit or suits against the United States of America, based on seizure of the Company’s properties by the Government during the period * * * which commenced June 10,1940 and ended on or about November 22,1947, which your attorney deems necessary to file in order to protect your interests, and to turn over to you the proceeds of any recovery or recoveries realized therefrom; provided that all expenses of such suit or suits are to be borne by you.
Some five days after this communication was written, Mr. Garland, through counsel employed by him, instituted in the *806 name of the plaintiff case No. 50140 relative to the April 10, 1945-June 13, 1945 and the May 22, 1946-June 30, 1947 seizures.
All the proceedings in cases numbered 49351 and 50140 have been conducted by counsel employed by Mr. Garland for such purposes.
The defendant contends in its brief that the plaintiff does not have any interest in the present litigation, that the statements in the pending petitions to the effect that the plaintiff is the sole owner of the claims asserted in the petitions and has not assigned any part of such claims are false, and, therefore, that the petitions should be dismissed.
A false statement in a petition before this court to the effect that there has been no assignment of the claim sued upon can, under some circumstances, form the basis of a plea in fraud by the Government. The Globe Works v. United States, 45 C. Cls. 497, 504-505 (1910). In the present litigation, however, the defendant’s brief specifically disclaims any charge of fraud respecting the matters now under discussion. Consequently, we do not have for consideration the applicability to these cases of 28 U. S. C. 2514, which declares in part that:
A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
The sanction of forfeiture under this statutory provision is harsh, and it can be invoked only when the Government assumes the burden of pleading and proving that a claimant has corruptly practiced or attempted to practice fraud against the United States in the proof, statement, establishment, or allowance of his claim. The Globe Works v. United States, supra, at p. 508. That has not been done in the present cases.
We turn, then, to Eule 20 (a) of the rules of this court, which appears to be the principal basis for the defendant’s argument on the point now Under discussion. Eule 20 (a) provides in pertinent part as follows:
Every action shall be prosecuted in the name of the real party in interest * * *.
*807 The question arises, therefore, as to who is “the real party-in interest” in the present litigation.
When the plaintiff’s mine was temporarily taken and retained by the defendant for the periods November 1, 1943-June 21, 1944, April 10, 1945-June 13, 1945, and May 22, 1946-June 30, 1947, there arose in favor of the plaintiff claims for just compensation under the Fifth Amendment. Although the plaintiff and the Garland group have apparently proceeded on the assumption that the beneficial interests in these claims passed to the Garland group, that assumption is incorrect. Even if the letters dated February 28,1950 and May 4,1951 are to be construed as purporting to assign the plaintiff’s claims, or interests in the claims, to the Garland group, such attempted assignments are null and void.
With exceptions not material to these cases, Section 3477 of the Revised Statutes, as amended (31 U. S. C. 203), provides that:
All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, * * * and all * * * orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void * * *.
This language could hardly be more explicit or comprehensive. Spofford v. Kirk, 97 U. S. 484, 488 (1878). It plainly deprives the letters dated February 28,1950 and May 4,1951 of any legal effect and leaves with the plaintiff its claims for just compensation growing out of the three mine seizures that are involved in the present litigation. Hence, the plaintiff is “the real party in interest” in these cases.
Of course, we have the unusual situation of the plaintiff merely acquiescing in the prosecution of the present suits in its name by counsel employed by someone else, who is bearing the costs of the litigation in the hope and with the expectation that the plaintiff will pay over to him and his associates the proceeds of the litigation, because of the past history previously related. Such a situation is not in accord with the principles of the orderly administration of justice. See Nils P. Severin v. United States, 99 C. Cls. 435, 444 (1943), *808 cert, denied 322 U. S. 733. However, in the absence of an allegation of fraud by the defendant and adequate proof supporting the allegation, this is not sufficient to warrant the dismissal of the petitions.
Judgment will be entered in plaintiff’s favor in case No. 49351 in the amount of $1,080, and in case No. 50140, in the amount of $3,065.48, plus interest at four (4) percent per annum on $1,080.00 in case No. 49351 from June 21, 1944 to date of payment, and on $3,065.48 in case No. 50140 from June 30,1947 to date of payment.
It is so ordered.
Jones, Chief Judge, took no part in the consideration and decision of these cases.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastin G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in the City of Knoxville, Tennessee.
2. (a) The plaintiff is, and for a number of years has been, engaged in the business of mining and marketing bituminous coal. In carrying on this business, the plaintiff is the lessee of approximately 1,465 acres of coal-bearing lands located in a mountainous section of Campbell County, Tennessee. The leased area consists of three tracts of land. Two of the tracts, aggregating approximately 1,149 acres, are owned by the Coal Creek Mining & Manufacturing Company. The third tract, which is situated between the other two tracts and adjoins each of them, includes approximately 316 acres and is owned by the East Tennessee Iron & Coal Company.
(b) The three tracts of land referred to in paragraph (a) of this finding are held by the plaintiff under a lease which was issued by the Coal Creek Mining & Manufacturing Company and the East Tennessee Iron & Coal Company jointly to the plaintiff on November 28, 1939. The lease is for a term of 40 years, and it grants the plaintiff an option to renew it for an additional period of 30 years upon the *809 expiration of the primary 40-year term. Under the lease, the plaintiff has the exclusive right to mine coal from the seams lying above a specified depth in the leased lands. The plaintiff is required by the lease to pay the lessors a royalty of 10 cents per ton on the coal produced under the lease, payment on a minimum production of 100,000 tons per year being guaranteed.
(c) The plaintiff is prohibited by the provisions of the lease from assigning or transferring the lease, or from subletting the leased property, to any other person without the written consent of both lessors.
3. The plaintiff opened a coal mine on the leased lands mentioned in finding 2, and began the production of coal from the mine in January 1941. Although the quality, quantity, and availability of the coal made the plaintiff’s leasehold potentially valuable, the plaintiff’s mining operations were conducted at a financial loss each year down to and including the year 1949.[1] These losses were due principally to inadequate equipment and poor management.
4. During the overall period involved in these suits, i. e., November 1,1943-June 30,1947, the plaintiff’s capital stock was owned by a group of men living in Knoxville, Tennessee. Frank Garland was the principal member of the group. He owned 30 percent of the plaintiff’s capital stock; he was president of the plaintiff; and, with the assent of the other stockholders, he was in complete charge of the plaintiff’s affairs (except for the actions of the defendant related in subsequent findings).

Period of November 1, 1943-June 21, 1944.

5. On November 1, 1943, the President issued Executive Order 9393 (8 F. R. 14877), which provided in part as follows:
Whereas widespread stoppages have occurred in the coal industry and strikes are threatened which will obstruct the effective prosecution of the war by curtailing vitally needed production in the coal mines directly *810 affecting the countless war industries and transportation systems dependent upon such mines; and
Whereas it has become necessary for the effective prosecution of the war that the coal mines in which stoppages or strikes have occurred, or are threatened, be taken over by the Government of the United States in order to protect the interests of the nation at war and the rights of workers to continue at work:
Now, therefore, by virtue of the authority vested in me by the Constitution and laws of the United States particularly the War Labor Disputes Act (Public Law 89, 78th Congress), as President of the United States and Commander-in-Chief of the Army and Navy, it is hereby ordered as follows:
The Secretary of the Interior is authorized and directed to take immediate possession, so far as may be necessary or desirable, of any and all mines producing coal in which a strike or stoppage has occurred or is threatened, together with any and all real and personal property, franchises, rights, facilities, funds, and other assets used in connection with the operation of such mines, and to operate or arrange for the operation of such mines in such manner as he deems necessary for the successful prosecution of the war, and to do all things necessary for or incidental to the production, sale and distribution of coal.
In carrying out this order, the Secretary of the Interior * * * shall permit the management to continue its managerial functions to the maximum degree possible consistent with the aims of this order.
❖ * ❖ * *
Possession and operation of any mine or mines hereunder shall be terminated by the Secretary of the Interior as soon as he determines that possession and operation hereunder are no longer required for the furtherance of the war program, but in no event more than sixty days after the restoration of the productive efficiency thereof prevailing prior to the taking possession thereof.
* * * * *
6. (a) Pursuant to Executive Order 9393, the Secretary of the Interior on November 1, 1943 issued Order No. 1888 (8 F. R. 15199) declaring that:
By virtue of the authority vested in me by the President of the United States by Executive Order dated November 1, 1943, and having determined that a strike *811 or stoppage lias occurred or is threatened at each and all of the coal mines operated by the mining companies listed in Appendix A, attached hereto and made a part hereof, I do hereby, effective forthwith, take possession of each and all of such coal mines, including any and all real and personal property, franchises, rights, facilities, funds and other assets used in connection with the operation of such mines.
The Regulations for the Operation of Coal Mines Under Government Control, as amended (8 F. R. 6655, 10712, 11844), heretofore issued by me, together with such further regulations as may from time to time be issued, shall in all respects be applicable to the mines possession of which is taken by the Government.
The President of each of the mining companies listed in Appendix A heretofore referred to (or if there is no president, its chief executive officer) is hereby, and until further notice, designated operating manager for the United States for each and all of the mines of the company. Unless advice to the contrary is received within ten days, the aforesaid President (or chief executive officer) shall be deemed to have accepted such designation. As operating manager for the United States, he is authorized and directed to operate any and all such mines in accordance with the aforementioned Eegula-tions for the Operation of Coal Mines Under Government Control, and such further regulations as may from time to time be issued, and to do all things necessary and appropriate for the operation of such mines and for the production, distribution and sale of their products.
The operating manager for the United States shall forthwith fly the flag of the United States at each of the mining properties of his company and shall conspicuously display at each of such properties copies of a poster to be supplied by the Department of the Interior and reading
NOTICE
In accordance with the proclamation of the President of the United States, Government possession of the coal mines of this mining company has been taken by Order of the Secretary of the Interior.
(b) The plaintiff was one of the mining companies listed in Appendix A to Order No. 1888.
7. Possession of the plaintiff’s mine under Order No. 1888 continued from November 1, 1943 until June 21, 1944, inclusive.
*812 8. During the period November 1,1943-June 21,1944, the regulations governing the operation of coal mines under Government control provided in part as follows:[2]
§ 801.4 Purpose of operation. The primary object of Government intervention in the operation of the said properties is the maintenance of full production of coal for the effective prosecution of the war. All duties and authorities set forth in these regulations are to be construed in the light of this purpose, and if any regulation interferes with the accomplishment of this purpose, prompt application must be made to the Solid Fuels Administrator for War to secure the waiver or modification of such regulation.
§ 801.5 Plan and policy of operation, (a) Control of the operations of the coal mines will be exercised by the Government to the extent necessary to maintain maximum production. Wherever the cooperation of the company and its personnel can be secured, the existing organization of the mining company will be utilized, and the company will continue operation in the regular course of business as a going enterprise, conforming with such directions as the Government may issue. Where the prompt and effective cooperation of a company cannot be secured, appropriate action will be taken under §§ 801.30 and 801.31.
(b) All properties in the possession of the Government shall be operated in a manner consistent with the fact that title to the properties remains in the owners thereof and that the Government, having temporarily taken possession or custody, will assert only such rights as are necessary to accomplish the national purpose of continued and maximum production.
(c) Possession and operation by the Government are to be terminated as soon as this can be done without injury to the furtherance of the war program.
* * % * Jfi
ORGANIZATION EOR OPERATION
§ 801.10 Supervision and direction, (a) The power, authority, and discretion of the Secretary of the Interior with respect to the operation of coal mines may, *813 under the authority of Order No. 1847 of the Secretary of the Interior, dated July 27,1943, be exercised by the Coal Mines Administrator (hereinafter referred to as the Administrator) and, subject to his supervision, by the Deputy Coal Mines Administrator (hereinafter referred to as the Deputy Administrator) to the same extent and with the same effect as such power, authority, and discretion may be exercised by the Secretary of the Interior. The power, authority, and discretion of the Administrator and Deputy Administrator may be exercised by them through such personnel of the Coal Mines Administration and the Department of the Interior and in such manner as the Administrator or Deputy Administrator may determine.
*****
§ 801.11 Designation of Regional Managers. Within each region served by a field office of the Bituminous Coal Division of the Department of the Interior, the manager of the said office, or such other person as the Administrator may appoint, shall serve as Regional Bituminous Coal Manager. * * *
*****
§ 801.15 Designation of Operating Managers, (a) The operation of the coal mines of a mining company will ordinarily be entrusted to an officer of the company formerly in charge of operations who is authorized to act for the said company and who will, under appointment by the Administrator, during the period of Government control, act as Operating Manager for the United States, while continuing to serve as an officer and employee of the mining company. At the request of the said company, such person may be removed from the position of Operating Manager for the United States, and an officer or employee of the company nominated by the company may be appointed by the Administrator.
(b) Where the prompt and effective cooperation of the mining company in the operation of the coal mines under Government control cannot be secured, a person other than an officer or employee of the company may be designated as the Operating Manager for the United States by the Administrator.
(c) Where a company is in receivership or trusteeship, the receiver or trustee will ordinarily be designated Operating Manager for the United States.
§ 801.16. Status off Operating Managers, (a) Any officer or employee or a mining company who, with the permission of, or without objection from, the said com *814 pany, accepts designation as Operating Manager for the United States of the coal mines of said company shall, together with all other officers and employees, serve in full recognition of his responsibilities to the Government and subject to all orders and regulations of the Administrator, but he and all other officers and employees shall serve as agents and employees of the company with respect to all actions which they would have been empowered to take on behalf of the company in the absence of Government control of its property.
(b) The Operating Manager shall continue to be subject to all restrictions and limitations imposed by the company upon his exercise of his authority. In respect of any action to which or in which the company requires its special consent or concurrence, the Operating Manager shall obtain such consent or concurrence before he takes such action. If consent is denied, the Operating Manager shall so report to the Regional Manager, stating the circumstances of the denial. The Regional Manager shall transmit the report to the Administrator, and the Operating Manager may proceed to take the action in question only upon direction of the Administrator.
(c) Designation of any person as Operating Manager for the United States shall not be deemed to constitute him an officer or employee of the United States within the meaning of Federal statutes governing personnel.
(d) The appointment of any Operating Manager shall terminate at the discretion of the Administrator upon notice to the Operating Manager.
§ 801.17 Duties of Operating Managers, (a) Operating Managers shall perform for their companies ordinary duties of management in accordance with established policies and practices, so far as consistent with these regulations and the instructions and orders of the Administrator and Regional Managers, and shall in addition perform all special duties placed on them as Operating Managers of the United States by these regulations, by their appointment instructions, so far as consistent with these regulations, and by such orders as the Administrator or the Regional Managers may issue.
(b) An Operating Manager is authorized to take all necessary action in the manner in which and through the officials by which it has been customarily accomplished and may, as should be necessary and convenient, take action either under his customary title and designation or as “Operating Manager for the United States, (name of company)”, as hereinabove and hereinafter specified. No Operating Manager for the United States *815 of any mining company is authorized or shall be regarded as having authority, express or implied, to bind or impose any liability on the United States or any of its officials or agents in the absence of a specific direction or order by the Administrator to that effect. Nor shall any operations of any mine property in the possession and control of the Government, or the proceeds, earnings or liabilities of such mine property in any event be, or be regarded as being, for the account or at the risk or expense of the Government except as a specific written direction or order to that effect shall have been given by the Administrator.
OPERATION OE MINES
§ 801.20 Statement of property taken. The Operating Manager of each mine shall promptly submit to the Regional Manager of the area in which the mine is located a statement specifically enumerating and defining the properties under his management, in accordance with a form to be furnished by the Administrator. Such statement shall be promptly submitted' by the Regional Manager to the Administrator with recommendations as to any corrections that may appear proper and shall be subject to such correction as the Administrator, or any other official specifically designated for the purpose by the Administrator, shall from time to time find to be necessary. A copy of such revised statement shall be returned to each Operating Manager to serve as a guide to him and any successor Operating Manager in the performance of their functions.
§ 801.21 Accounts and records, (a) The Operating Manager shall set up and keep the books and records of the company in a manner such that the period of Government operation will be separate, or may be readily separated, from the operation of the company previously operating the mines as a private enterprise. The same set of books may be used so long as items of payments, receipts, and all other transactions engaged in on and after May 1, 1943, may be easily separated from items concerning transactions engaged in before that date.
(b) The Operating Manager shall render such accounting as the Administrator may, from time to time, prescribe.
§ 801.22 Financial and commercial transactions. (a) Ordinary financial and commercial transactions shall be carried on so far as possible, in accordance with the customary procedures and policies of the mining *816 company. The Operating Manager shall enter into such financial transactions, either by way of receipt or expenditure, as are necessary to continue the enterprise, utilizing any funds or properties due or belonging to the mining company, and shall draw upon the funds and accounts of the company, utilizing customary sources of credits or funds, and make all necessary disbursements.
§ 801.24 Application of Federal and 8tate lanm. (a) The mining companies, their personnel and their property are deemed to remain subject during the period of Government control to all Federal and State laws and to actions, orders, and proceedings of all Federal and State courts and administrative agencies. The companies are expected to meet all Federal, State and local taxes, contributions, and assessments in the customary manner.
(b) The mining companies are deemed to remain subject to suit as heretofore. However, no Operating Manager or Regional Manager is authorized to bring suit, accept service, or enter any legal proceeding, on behalx of the United States without specific direction from the Administrator. Information as to the pendency, necessity, or probability of any legal proceeding which casts in question any right of the United States should be promptly transmitted by the Operating Manager to the Regional Manager and by the latter officer to the Administrator, with appropriate recommendations concerning the assignment of legal counsel if such assignment is indicated.
(c) The possessory interest of the United States in the properties of the companies is deemed to be protected by the criminal laws protecting United States property.
§ 801.25. Interim procedure for confirmation of financial responsibility by mining company — (a) Execution and delivery of instrument of agreement and certification. Any mining company, by a duly authorized officer or agent, may execute and deliver to the Administrator an instrument of agreement and certification (in the form to be prescribed by the Administrator) confirming (as hereinafter provided) the sole financial responsibility of the mining company for its operations. Such mining company may, however, as hereinafter set forth, reserve to itself the right to assert claims for liability against the Government with respect to damage allegedly resulting from any specific direction or order *817 of the Coal Mines Administration. The operating manager for the coal mines of any mining company for which such instrument of agreement and certification is in effect shall not be subject to the requirements as to financial transactions and current accountings set forth in § 801.26. The instruments of agreement and certification may be terminated by the mining company at any time upon ten days’ written notice, as hereinafter provided.
:¡c * * * *
§ 801.26 Requirements as to financial transactions and cwrrent accountings. The operating manager for the coal mines of any mining company for which an instrument of agreement and certification as provided in § 801.25 is not in effect shall not make major disbursements of an extraordinary nature or dividend payments and shall not incur indebtedness other than in the course of normal business unless-:
(a) At least ten days prior to the making of such disbursement or payment or the incurring of such indebtedness, the operating manager shall have filed with the Administrator a notice of intention to make such disbursement or payment or to incur such indebtedness, specifying in detail the amount and nature of and the necessity for the proposed disbursement, payment, or indebtedness, and the effect thereof upon the preservation by the mining company of a working capital sufficient to enable it to maintain maximum possible production; and
(b) The Administrator shall have advised the operating manager that he has no objection thereto.
# * * * *
ENEOECEMENT OE REGULATIONS AND ORDERS
§ 801.80 Enforcement powers of Regional Managers. In any case where the prompt and effective cooperation of a mining company cannot be secured, the Regional Manager may issue appropriate instructions for the operation of the coal mines of such company and shall immediately report the circumstances and his instructions to the Administrator. Pending receipt of directions from the Administrator, it shall be the duty of the Regional Manager to deny access to the premises to persons not contributing to the operation of the enterprise, to prevent any interference with the coal mines or the operations under Government eontrol, and to see that the production of coal is continued.
*818 § 801.31 Removal of Operating Managers. Upon failure of an Operating Manager to comply with these regulations or the orders of the Administrator or the Eegional Managers or upon failure of a mining company to respect the action taken by its Operating Manager who is an official of the company, the Regional Manager shall report to the Administrator the desirability of the removal of the Operating Manager, with such recommendations for a substitute as he may wish to make.
*****
TERMINATION OF GOVERNMENT CONTROL
§ 801.40 Method of termination. Government possession and control of any property affected by these regulations will be terminated by the Administrator upon a determination by him that the requirements for the termination of such possession and control specified in the War Labor Disputes Act of June 25, 1943, have been fulfilled. * * *
*****
Forthwith upon the termination of such possession and control by the Administrator, the mining company may elect to execute and deliver to the Administrator one of the two instruments described in paragraphs (a) and (b) below: _
_ (a) The mining company, by a duly authorized officer or agent, not later than ten days subsequent to such tennination, unless such period is extended by the Administrator for good cause shown, shall execute and deliver to the Administrator an instrument of ratification (in the form, to be prescribed by the Administrator) by which the mining company adopts and ratifies all acts performed by, and omissions of, the Operating Manager for the United States in the operation of the coal mines of the company during the period of Government control, and covenants and agrees that the Government of the United. States and its officials shall not be subject to any claims by the mining company or others by reason of the possession and control of the coal mines of the mining company.
*****
(b) The mining company, by a duly authorized officer or agent, not later than ten days subsequent to such termination, unless such period is extended by the Administrator for good cause shown, shall execute and *819 deliver to the Administrator an instrument which specifically reserves to the mining company the right to assert a claim for damage alleged to have been suffered by it during the period of Government possession and control as the direct result of a specific direction or order of the Administrator, or his duly authorized agent, but which in all other respects is the same as Instrument No. 1. * * *
$ $ ‡ ‡ ‡
If, however, within ten days after the termination of possession and control by the Government, * * * the mining company shall not execute and deliver to the Administrator either Instrument No. 1 or Instrument No. 2, as above provided, then the Administrator may assume that the mining company claims, or reserves the right to claim, that all operations during the period of Government possession and control of the property have been for the account of the Government, and accordingly that the Operating Manager for the United States and the mining company are accountable to the Government for their custodianship and disposition of proceeds from operations accruing during the period of Government possession and. control. * * *
Accordingly, in such an event the Operating Manager for the United States and .the mining company shall forthwith cause to be prepared, and shall promptly furnish to the Administrator, the following:
1. A detailed Comparative Balance Sheet as of the date of the termination of Government possession and control and as of the date of the beginning of such period.
2. A detailed Statement of Income and Profit and Loss for the period of Government possession and control.
8. A physical inventory to be taken at the close of such period, for all items normally subject to inventory.
4. A Cost and Tonnage Statement for the period in the form to be prescribed by the Administrator.
5. A detailed analysis of all changes in Current Assets, Investments, Reserves, Fixed Assets- and Deferred Charges accounts occurring during the period.
6. A. detailed statement of all charges to Bad Debts or against Reserves therefor.
7. An explanation of the basis of charges for Depreciation, Depletion and Amortization for the period.
8. A detailed analysis of all changes in amounts due to or from affiliated companies.
*820 9. On or about November 1, 1943, a telegram was dispatched by or on behalf of the Secretary of the Interior to the plaintiff, stating that operations at the plaintiff’s mine were to continue as theretofore.
10. The plaintiff’s president did not, within ten days after the issuance of Order No. 1888 or at any other time, decline to serve as operating manager of the plaintiff’s mine for the United States; and the plaintiff’s president did, in fact, serve as operating manager of the plaintiff’s mine for the United States during the period November 1, 1943-June 21, 1944.
11. On November 2, 1943, the Secretary of the Interior transmitted to the plaintiff’s president (and to the president of each other mining company affected by Order No. 1888) a letter stating as follows:
By virtue of the authority vested in me by the President of the United States, I have signed an order taking possession of any and all of the coal mines of your company. The primary object of Government possession of the mines is the maintenance of full prodüction of coal for the effective prosecution of the war.
As chief executive officer of your company, you have been designated Operating Manager for the' United States for each and all of its mines. Unless you advise me to the contrary within ten days, you will be deemed to have accepted that designation. You are being called upon as a loyal and patriotic American to serve as Operating Manager and to do everything possible to assure operation of the mines at maximum capacity.
The Regulations for the Operation of Coal Mines Under Government Control, as amended (8 F. R. 6655, 10712, 11344), which I have issued heretofore, will be applicable to the present period of Government possession, and operation of your mines shoüld be conducted in accordance with the provisions of those Regulations.
All officials and employees of the company are to perform their usual functions and duties in connection with the mine operations. The existing managerial set-up should be used as far as practicable. You should make every effort to encourage the miners to resume work under the present terms and conditions of work.
Arrange immediately to fly the flag of the United States on the mining premises. Copies of a notice of *821 Government possession will be supplied to. you as soon as possible. You should display that notice conspicuously at each of your properties.
Please fill in the form enclosed immediately, sign it, and return it promptly to the Department of the Interior, Washington 25, D. C.[3]
If you are not acting as chief executive officer of the company, this communication is to be considered as directed to the officer who is so acting.
12. (a) In accordance with Order No. 1888 and the letter dated November 2, 1948 from the Secretary of the Interior, the plaintiff’s president caused the flag of the United States to be flown on the premises of the plaintiff’s mine, and he caused to be displayed conspicuously on such premises the poster or notice prescribed by the concluding paragraph of Order No. 1888.
(b) The plaintiff’s president did not prepare and return the form mentioned in the penultimate paragraph of the letter dated November 2, 1943 from the Secretary of the Interior until after the receipt of a subsequent letter dated December 1, 1943 from the Deputy Coal Mines Administrator calling attention to the failure to submit the form and directing immediate compliance with this requirement.
13. (a) Because of the defendant’s action in taking possession of the plaintiff’s mine on November 1,1943, the strike and work stoppage which previously existed at the plaintiff’s mine came to an end, and mining operations were conducted at the mine during the period of the defendant’s possession under Order No. 1888.
(b) During the period November 1, 1943-June 21, 1944, approximately 42,000 tons of coal were produced at the plaintiff’s mine.
14. (a) Under the date of November 20, 1943, the plaintiff’s president addressed to the Secretary of the Interior a letter stating as follows:
As operating manager for the Government, I want to recommend that we proceed just as we would if I *822 were operating this property for the individual stockholders. My suggestion is that we assess and collect fines of $1.00 per day against the miners who were out on strike from November 1 to about November 10. This is in line with the contract under which I think we are supposed to be operating.
Further, I recommend that we do not on any account, pay our employees $40.00 as a settlement of any claim they might have against us by reason of the portal to portal feature which in some quarters it is assumed caused a violation of the wage and hour law as our mine is practically new having started shipments in volume in late 1941 so that even now there is only a negligible amount of time consumed in traveling from the portal to the working face and vice versa, hence, if we have any liability, which I do not believe we have, the amount will be very small.
Will you kindly issue instructions covering?
(b) The following reply to the letter set out in paragraph (a) of this finding was transmitted to the plaintiff’s president by the Deputy Coal Mines Administrator under the date of December 16, 1943:
Your letter of November 20, 1943, addressed to Secretary Ickes, has been referred to me. You recommend that your company be authorized to assess and collect fines of $1 per day against the miners who engaged in strikes during the period November 1 through November 10, 1943, and that the company not be required to pay $40 in settlement of portal-to-portal claims prior to November 3, 1943, as at its mine only a negligible amount of time is consumed in travelling from the portal to the working place of the mine and vice versa. You ask that instructions be issued covering these matters.
The company should not assess fines against its mining employees for engaging in strikes during the period from November 1 to the date of receipt of the instructions to the Operating Managers for the bituminous coal mines dated November 20, 1943. However, the provisions in the district or other applicable agreements for the assessment of fines or other penalties for engaging in strikes, etc., are in effect and are to be strictly enforced from the date of the receipt of these instructions by the Operating Managers.
With respect to your inquiry concerning settlement of portal-to-portal claims, you are advised that in a letter *823 to the National War Labor Board dated November 12, 1943, Secretary Ickes stated as follows:
“While it is understood that the Secretary of the Interior has no responsibility under the Memorandum of Agreement to pay compensation for portal-to-portal claims prior to November 3, it is recognized that the mine workers have vigorously asserted a claim of liability therefor against the operators, that lawsuits in connection therewith are now pending, that the Illinois operators have offered to settle this liability by the payment of $40 in accordance with the agreement of September 23, 1943, and that the War Labor Board in its opinion of October 26, 1943, has approved the payment of this sum as a reasonable settlement. It is recognized, moreover, that the mine workers have continued work in the belief that their contractual disputes with the operators would be adjusted and adjusted retroactively. Against this background it is clear that maximum productive efficiency is not likely to be restored so long as the claim for past due portal-to-portal compensation remains unsettled. This being so, it is the clear responsibility of the operators and the mine workers to settle this issue at once.”
15. (a) On November 26, 1943, the plaintiff’s president addressed to the Secretary of the Interior a letter reading as follows:
This mine is being operated by me as operating manager for the account of the Federal Government, hence, I feel it incumbent to keep you closely advised and to send you recommendations concerning plans which I would make effective if I were conducting the activities of this company for the private owners.
Operations for the current month will reflect a substantial loss and it will be necessary for you to advance us approximately $5000.00 to take care of payroll, supply account, etc., and we ask that you let us have this by December 1. The finances of this company are not in good shape and prudent business practice would dictate closing down this mine until ceiling prices were increased to meet the added cost under the wage contract recently negotiated between you and the United Mine Workers. Theoretically, you undoubtedly estimate that our tonnage will be increased by the additional work time but this is not true nor do we expect an improvement over our previous loading. Our experience, as well as that of our two closely affiliated companies, Bardo Coal Min *824 ing Company, Bardo, Kentucky and Fox. Ridge Mining Company, Pmeville, Kentucky, is that while tonnage was up slightly when the miners returned to work which is always the case after a shut down, it has now gotten back to the level prior to the work stoppage which means that we have the increased cost with no additional tonnage..
At this mine the first shift started working the nine hours when they resumed work on November 10, but the second shift refused to work beyond eight hours. . On Tuesday of this week, the 23rd, our first shift notified our local superintendent through their committee that they would likewise not work in excess of eight hours. One reason I believe is the fact that we have within the past few weeks opened a new seam of coal on this property and the men working in this so-called red ash seam have no travel time. They refused, of course, to put in productive work for 45 minutes for which under the agreement we are to pay them two-thirds of the regular rate. At our mine in the other seam which is comparatively new, travel time amounts to about 20 minutes and our men will not work the other 25 minutes for the total travel time allowance of 45 minutes if they pay them only two-thirds of the regular rate. Our local superintendent, Mr. J. M. Patteson, states, and I agree with him, that our men have taken a reasonable position. Our thought is that the simplest way to handle our situation is to work the men eight hours productive work per shift paying them time and one-half for over 40 hours per week and in this way we will not require a staff of certified accountants to figure our payroll.
You can recognize the urgency of our situation from the above description and can likewise easily conclude that we cannot continue in production except at a major loss unless and until ceiling prices are increased by a substantial amount.
(b) No advance was made or other action taken by the defendant in response to the communication mentioned in paragraph (a) of this finding.
16. Under the date of January 25, 1944, the Deputy Coal Mines Administrator addressed to the plaintiff’s president (and to all other operating managers of bituminous coal mines affected by Order No. 1888) a communication stating as follows:
The following interpretations are hereby issued in supplementation of the Summary of Terms and Conditions of Employment dated November 20,1943:
*825 • 1. Laying Men Off During the Week to Work them on Sunday
Each, employee must be given the opportunity to work on each of the days that the mine produces coal during the week even though such employee performs necessary maintenance and safety work on Sunday. The management will not be required to pay any men for the days on which they have heretofore been laid off. Fines collected during the present period of Government possession for strikes attributable to the practice of the management in laying off men during the week to work them on Sunday shall be refunded immediately.
2. Purchase of Tools of Tonnage and Other Piece Workers
Under the provisions of Paragraph 9 of the Instructions to the Operating Managers, dated November 20, 1943, the management of bituminous coal mines, where it has not already purchased the tools owned by the worker or entered into some satisfactory settlement with respect to the matter, is required, at the option of each tonnage or other piece worker, to purchase the tools the tonnage mine worker owns at a price which is equivalent to one cent per ton for all coal mined by each such tonnage worker between April 1, 1943, and November 3, 1943, with a minimum payment of $3.00. A satisfactory settlement with respect to this matter, in order to comply with the provisions of this paragraph, miist consist of an express agreement between the management and appropriate representatives or officials of the United Mine Workers of America. Compliance by the operator with the provisions of the directive order of the NWLB in the Appalachian dispute, dated June 18, 1943, in the absence of affirmative acquiescence of the mine workers, does npt constitute a_ satisfactory settlement within the meaning of the provisions of this paragraph. All disputes with respect to the existence of such an express agreement or affirmative acquiescence by the mine workers shall be determined in accordance with the customary grievance and dispute procedures.
3. Computation of Earnings of Mine Workers Who Make a Start But Do Not Work More Than Two Hours During the Shift Because of Breakdown, etc.
All inside employees working on a day-wage basis who make a start and go into the mine but who do not work *826 more than two hours during the shift, whether or not the mine works a full two hours, except in the event they voluntarily leave their work, shall be paid for two hours at the regular established straight rates and for an assumed 45 minutes of travel time at the special travel time rate provided in Paragraph 3 of the Instructions dated November 20. All inside tonnage and piece workers who make a start and go into the mine but who do not work more than two hours during the shift, whether or not the mine works a full two hours, except in the event they voluntarily leave their work, shall be paid for 45 minutes at the special travel time rate provided in Paragraph 4 of the Instructions, in addition to the payment at the regular established rates for all work done.
You are hereby directed as Operating Manager for the United States to comply immediately with the foregoing interpretations in the operation of bituminous coal mines in the possession of the Government which are subject to the Memorandum of Agreement dated November 3,1943.
All other matters relating to the application, interpretation, or effect of the November 3 Memorandum of Agreement or of the Summary of Terms and Conditions of Employment, dated November 20, shall be handled in accordance with the existing grievance machinery.
17. (a) Directives issued by the defendant during the period November 1, 1943-June 21, 1944 required the plaintiff to increase the vacation pay of its employees in the aggregate amount of $1,080.
(b) The defendant did not, during the period November 1, 1943-June 21, 1944, impose upon the plaintiff any other requirements that increased the plaintiff’s costs.
18. Except for the actions of the defendant mentioned in findings 5-17, the defendant left the plaintiff’s president free to use his discretion in conducting the plaintiff’s affairs during the period November 1, 1943-June 21, 1944.
19. The plaintiff suffered a net financial loss of $4,365.14 during the period November 1, 1943-June 21, 1944.
20. There is nothing in the evidence to indicate that the plaintiff’s loss during the period November 1, 1943-June 21, 1944 would have been less than $4,365.14 if the defendant had not taken and retained possession of the plaintiff’s mine during such period, or had not directed that the ben *827 efits mentioned in finding 17 (a) be provided for the plaintiff’s employees.
21. There is nothing in the evidence to indicate that the plaintiff would have been able to operate its mine during the period November 1, 1943-June 21, 1944 in the absence of the defendant’s actions in taking and retaining possession of the mine during such period and directing that the benefits referred to in finding 17 (a) be provided for the plaintiff’s employees.
22. The plaintiff did not, at any time during the period November 1, 1943-June 21, 1944, execute and deliver to the Coal Mines Administrator an instrument of agreement and certification in accordance with section 801.25 of the pertinent regulations (see finding 8).
23. Following the termination of the defendant’s possession of the plaintiff’s mine on June 21, 1944, the plaintiff failed to comply with the requirements imposed upon it by section 801.40 of the pertinent regulations (see finding 8).
24. The evidence fails to show that the plaintiff’s mine would have been rentable for the period November 1,1943-June 21, 1944 if the defendant had not taken and retained possession of the mine during such period. On the contrary, the inference is warranted that the mine would not have been rentable for such period because of the strike and work stoppage which occasioned the issuance of Executive Order 9393 and Order No. 1888 of the Secretary of the Interior, because it would not have been feasible for a sub-lessee to rehabilitate the mine for profitable operation during the relatively short period mentioned, and because there is nothing in the evidence to indicate that the consent of both of the plaintiff’s lessors to such a sublease could have been obtained.

Period of April 10, 1945-June 13, 1945

25. On April 10, 1945, the President issued Executive Order 9536 (10 F. R. 3939), providing in part as follows:
Whereas after investigation I find and proclaim that there are interruptions or threatened interruptions in the operation of the mines producing bituminous coal as a result of existing or threatened strikes and other labor *828 disturbances; that the coal produced by such mines is required for the war effort; that the war effort will be unduly impeded or delayed by such interruptions; and that the exercise, as hereinafter specified, of the powers vested in me is necessary to. insure, in the interest of the war effort, the operation of such mines:
Now, therefore, by virtue of the power and authority vested in me by the Constitution and laws of the United States, including section 9 of the Selective Training and Service Act of 1940 (54 Stat. 892) as amended, by the War Labor Disputes Act (57 Stat. 163), as President of the United States and Commander in Chief of the Army and Navy of the United States, it is hereby ordered as follows:
1. The Secretary of the Interior is authorized and directed to take possession of any and all such mines, and, to the extent that he may deem necessary, of any real or personal property, franchises, rights, facilities, funds, and other assets used in connection with the operation of such mines; to operate or to arrange for the operation of such mines in such manner as he may deem necessary for the successful prosecution of the war; and to do all things necessary for, or incidental to, the production, sale, and distribution of the coal produced, prepared, or handled by the said mines.
6. The Secretary of the Interior shall permit the managements of the mines taken under the provisions of this order to continue with their managerial functions to the maximum degree possible consistent with the aims of this order.
7. Possession of any mine or mines taken under this order shall be terminated by the Secretary of the Interior as soon as he determines that such possession is no longer required for the successful prosecution of the war, but in no event more than sixty days after the restoration of the productive efficiency of any such mine or mines prevailing prior to the taking of possession thereof.
26. (a) Pursuant to Executive Order 9536, the Secretary of the Interior on April 10,1945 issued Order No. 2044 (10 F. B. 3983) declaring that:
By virtue of the authority vested in me by the President of the United States by Executive order dated April 10, 1945, and having determined that a strike or work stoppage has occurred at each and all of the coal mines *829 listed in Appendix A, attached hereto and made a part hereof, I do hereby, effective forthwith, take possession of each and all of such coal mines, including any and all real and personal property, franchises, rights, facilities, funds and other assets used in connection with the operation of such mines.
The regulations for the operation of coal mines under government control, as amended (8 F. E. 6655, 10712, 11344, 17339), heretofore issued by me, together with such further regulations as may from time to time be issued, shall in all respects be applicable to the mines possession of which is taken by this order.
The President of each of the mining companies operating the mines listed in Appendix A (or if there is no president, its chief executive officer) is hereby, and until further notice, designated operating manager for the United States for each such mine. Unless advice to the contrary is received within ten days, the aforesaid President (or chief executive officer) shall be deemed to have accepted such designation. As operating manager for the United States, he is authorized and directed to operate any and all such mines in accordance with the aforementioned regulations for the operation of coal mines under Government control, and such further regulations as may from time to time be issued, and to do all things necessary and appropriate for the operation of such mines and for the production, distribution and sale of their products.
The operating manager for the United States shall forthwith fly the flag of the United States at each of the mining properties listed in Appendix A and shall conspicuously display at each of such properties copies of a poster to be supplied by the Department of the Interior and reading:
NOTICE
In accordance with the proclamation of the President of the United States, Government possession of the coal mines of this mining company has been taken by order of the Secretary of the Interior.
*830 (b) The plaintiff’s mine was one of those listed in Appendix A to Order No. 2044.
27. Possession of the plaintiff’s mine under Order No. 2044 continued from April 10, 1945 until June 13, 1945, inclusive.
28. The regulations set out in finding 8 were in effect during the period April 10,1945-June 13, 1945.
29. The plaintiff’s president did not, within ten days after the issuance of Order No. 2044 or at any other time, decline to serve as operating manager of the plaintiff’s mine for the United States; and the plaintiff’s president did, in fact, serve as operating manager of the plaintiff’s mine for the United States during the period April 10, 1945-June 13, 1945.
30. On April 10, 1945, an agent of the Secretary of the Interior sent the following telegram to the plaintiff:
Pursuant to the President’s Executive order, the Secretary of tire Interior today assumed possession of the following mines of your company Pewee. Request you open mines for work at usual hour on Thursday morning, April 12, 1945. Letter follows.
31. Under the date of April 10, 1945, the Secretary of the Interior addressed the following communication to the plaintiff’s president (and to the president of each other mining company affected by Order No. 2044) :
By virtue of the authority vested in me by the President of the United States, I have signed an order taking possession of certain coal mines of your company. The primary object of Government possession of the mines is the maintenance of full production of coal for the effective prosecution of the war.
As chief executive officer of your company, you have been designated Operating Manager for the United States for each of these mines. Unless you advise me to the contrary within ten days, you will be deemed to have accepted that designation. You are being called upon as a loyal and patriotic American to serve as Operating Manager and to do everything possible to assure operation of the mines at maximum capacity.
The Regulations for the Operation of Coal Mines Under Government Control, as amended (8 F. R. 6655, *831 10712, 11344, 17339), which I have issued heretofore, will be applicable to the present period of Government possession, and operation of the mines in Government possession should be conducted in accordance with the provisions of those Regulations.
All officials and employees of the company are to perform their usual functions and duties in connection with the mine operations. The existing managerial setup should be used as far as practicable. You should make every effort to encourage the miners to resume woi’k under the present terms and conditions of work.
Arrange immediately to fly the flag of the United States on the mining premises. Copies of a notice of Government possession will be supplied to you as soon as possible. You should display that notice conspicuously at each of your properties.
If you are not acting as chief executive officer of the company, this communication is to be considered as directed to the officer who is so acting.
32. In accordance with Order No. 2044 and the letter dated April 10,1945 from the Secretary of the Interior, the plaintiff’s president caused the flag of the United States to be flown at the plaintiff’s mine, and he caused to be displayed conspicuously at such mine the poster prescribed by the concluding paragraph of Order No. 2044.
33. (a) Because of the defendant’s action in taking possession of the plaintiff’s mine as of April 10,1945, the strike and work stoppage which previously existed at the plaintiff’s mine came to an end, and mining operations were conducted at the mine during the period of the defendant’s possession under Order No. 2044.
(b) During the period April 10, 1945-June 13, 1945, 7,-297.6 tons of coal were produced at the plaintiff’s mine.
34. Except for the actions of the defendant referred to in findings 25-33, the defendant left the plaintiff’s president free to use his discretion in conducting the plaintiff’s affairs during the period April 10, 1945-June 13, 1945.
35. During the period April 10, 1945-June 13, 1945, the defendant did not issue any directives which increased the plaintiff’s costs.
36. (a) The plaintiff suffered a net financial loss of $3,077.14 during the period April 10, 1945-June 13, 1945.
*832 (b) The plaintiff suffered a net financial loss of $2,303.08 during the April 10,1945-May 9,1945 portion of the period mentioned in paragraph (a) of this finding.
(c) The plaintiff suffered a net financial loss of $774.06 during the May 10,1945-June 13,1945 portion of the period mentioned in paragraph (a) of this finding.[4]
37. There is nothing in the evidence to indicate that the plaintiff’s loss during the period April 10, 1945-June 13, 1945 would have been less than $3,077.14 if the defendant had not taken and retained possession of the plaintiff’s mine during such period.
38. There is nothing in the evidence to indicate that the plaintiff would have been able to operate its mine during the period April 10, 1945-June 13, 1945 in the absence of the defendant’s action in taking and retaining possession of the mine during such period.
39. The plaintiff did not, at any time during the period April 10, 1945-June 13, 1945, execute and deliver to the Coal Mines Administrator an instrument of agreement and certification in accordance with section 801.25 of the pertinent regulations (see finding 8).
40. Following the termination of the defendant’s possession of the plaintiff’s mine on June 13, 1945, the plaintiff did not comply with section 801.40 of pertinent regulations (see finding 8). Although the noncompliance was called to the plaintiff’s attention by means of a letter dated August 21, 1945 from an agent of the defendant, the plaintiff persisted in its noncompliance, since it assumed that compensation could not be obtained from the executive branch of the defendant for the defendant’s actions in relation to the plaintiff’s mine during the period April 10, 1945-June 13, 1945.
41. The evidence fails to show that the plaintiff’s mine would have been rentable for the period April 10, 1945-June 13, 1945 if the defendant had not taken and retained possession of the mine during such period. On the contrary, the inference is warranted that the mine would not have been rentable for such period because of the strike and work stoppage which occasioned the issuance of Execu *833 tive Order 9536 and Order No. 2044 of the Secretary of the Interior, because it would' not have been feasible for a sub-lessee to rehabilitate the mine for profitable operation during the short period mentioned, and because there is nothing in . the evidence to indicate that the consent of both of the plaintiff’s lessors to such a sublease could have been obtained.

Period of May 19J¡.6-June 30,19If?

42. On May 21,1946, the President issued Executive Order 9728 (11 E. E. 5593), providing in part as follows:
• Whereas after investigation I find and proclaim that there are interruptions or threatened interruptions in the operation of the mines producing bituminous coal as a result of existing or threatened strikes and other labor disturbances; that the coal produced by such mines is required for the war effort and is indispensable for the continued operation of the national economy during the transition from war to peace; that the war effort will be unduly impeded or delayed by such interruptions; and that the exercise, as hereinafter specified, of the powers vested in me is necessary to insure the operation of such mines in the interest of the war effort and to preserve the national economic structure in the present emergency:
Now, therefore, by virtue of the power and authority vested in me by the Constitution and laws of the United States, including Section 9 of the Selective Training and Service Act of 1940 ( 54 Stat. 892) as amended by the War Labor Disputes Act (57 Stat. 163), as President of the United States and Commander-in-Chief of the Army and Navy of the United States, it is hereby ordered as follows
1. The Secretary of the Interior is authorized and directed to take possession of any and all such mines, and, to the extent that he may deem necessary, of any real or personal property, franchises, rights, facilities, funds, and other assets used in connection with the operation of such mines; to operate or to arrange for the operation of such mines in such manner as he may deem necessary in the interest of the war effort; and to do all things necessary for, or incidental to, the production, sale, and distribution of the coal produced, prepared, or handled by the said mines.
*834 6. The Secretary of the Interior shall permit the management of the mines taken under the provisions of this order to continue with their managerial functions to the maximum degree possible consistent with the aims of this order.
*****
8. Possession of any mine or mines taken under this order shall be terminated by the Secretary of the Interior as soon as practicable, but in no event more than sixty days after the restoration of the productive efficiency of any such mine or mines prevailing prior to the taking of possession thereof.
43. (a) Pursuant to Executive Order 9728, the Secretary of the Interior on May 22, 1946 issued Order No. 2200 (11 F. R. 5603) declaring that:
By virtue of the authority vested in me by the President of the United States by Executive Order 9728, dated May 21,1946, and having determined that a strike or work stoppage has occurred or is threatened at each and all of the coal mines listed in Appendix A, attached hereto and made a part hereof, I do hereby take possession of each and all such coal mines, including any and all real and personal property, franchises, rights, facilities, funds and other assets used in connection with the operation of such mines'.
The Regulations for the Operation of Coal Mines under Government Control, as amended (8 F. R. 6655, 10712,11344, 17339), heretofore issued by the Secretary of the Interior, and such revisions thereof as may from time to time be issued, shall be applicable to the mines possession of which is taken by this order.
The President of each of the mining companies operating the mines listed in Appendix A (or if there is no president, its chief executive officer) is hereby, and until further notice, designated Operating Manager for the United States for each such mine. Unless advice to the contrary is received within ten days, the aforesaid President (or chief executive officer) shall be deemed to have accepted such designation. As Operating Manager for the United States, he is authorized and directed to operate any and all such mines in accordance with the aforementioned Regulations for the Operation of Coal Mines Under Government Control, as amended, and such revisions thereof as may from time to time be issued, and to do all things necessary and appro *835 priate for the operation of such mines and for the production, distribution and sale of their products.
The Operating Manager for the United States shall forthwith fly the flag of the United States at each of the mining properties listed in Appendix A and shall conspicuously display at each of such properties copies of a poster to be supplied by the Department of the Interior and reading
NOTICE
In accordance with the Executive order of the President of the United States, Government possession of this coal mine has been taken by Order of the Secretary of Interior.
(b) The plaintiff’s mine was one of those listed in Appendix A to Order No. 2200.
44. Possession of the plaintiff’s mine under Order No. 2200 of the Secretary of the Interior continued from May 22, 1946 until June 30,1947, inclusive.
45. The regulations set out in finding 8 were, with minor changes of no importance in connection with the present litigation, [5] in effect during the period May 22, 1946-June 30, 1947.
46. The plaintiff’s president did not, within ten days after the issuance of Order No. 2200 or at any other time, decline to serve as operating manager of the plaintiff’s mine for the United States; and the plaintiff’s president did, in fact, serve as operating manager of the plaintiff’s mine for the United States during the period May 22,1946-June 30,1947.
47. Under the date of May 22, 1946, the Secretary of the Interior addressed the following communication to the plaintiff’s president (and to the president of each other mining company affected by Order No. 2200) :
By virtue of the authority vested in me by the President of the United States, I have signed an order taking possession of any and all of the coal mines of your company. I have designated Vice Admiral Ben Moreell Deputy Coal Mines Administrator and delegated to him full authority to act on my behalf. The primary object of Government possession of the mines *836 is the maintenance of full production of coal in the interest of the continued operation of the national economy during the transition from war to peace.
As chief executive officer of your company, you have been designated Operating Manager for the United States for each and all of the company’s mines. Unless you advise the Deputy Coal Mines Administrator to the contrary within ten days, you will be deemed to have accepted that designation. You are being called upon as a loyal American to serve as Operating Manager and to do everything possible to assure operation of the mines at maximum capacity.
The Regulations for the Operation of Coal Mines Under Government Control, as amended (8 F. R. 6655, 10712, 11344, 17399), which have been issued heretofore, will be applicable to the present period of Government possession, and operation of your mines should be conducted in accordance with the provisions of those Regulations.
All officials and employees of the company are to perform their usual functions and duties in connection with the mine operations. The existing managerial set-up ¡should be used as far as practicable. You should make every effort to encourage the miners to work under the present terms and conditions of employment.
Arrange immediately to fly the flag of the United States on the mining premises. Copies of a notice of Government possession will be supplied to you as soon as possible. You should display that notice conspicuously at each of your properties.
Please fill in the form enclosed immediately, sign it, and return it promptly to the Deputy Coal Mines Administrator, Department of the Interior, Washington 25, D. C.[6]
If you are not acting as chief executive officer of the company, this communication is to be considered as directed to the officer who is so acting.
48. (a) In accordance with Order No. 2200 and the letter dated May 22, 1946 from the Secretary of the Interior, the plaintiff’s president caused the flag of the United States to be flown at the plaintiff’s mine, and he caused to be conspicuously displayed at the mine the poster prescribed by the concluding paragraph of Order No. 2200.
*837 (b) The plaintiff’s president also prepared and returned the form referred to in the penultimate paragraph of the letter dated May 22,1946 from the Secretary of the Interior.
49. (a) Because of the defendant’s action in taking possession of the plaintiff’s mine as of May 22, 1946, the strike and work stoppage which previously existed at the plaintiff’s mine came to an end, and mining operations were conducted at the plaintiff’s mine during the period of the defendant’s possession under Order No. 2200 (except that such operations were prevented for approximately five months because of a fire that occurred at the mine).
(b) During the period May 22, 1946-June 30, 1947, 30,-265.05 tons of coal were produced at the plaintiff’s mine.
50. On May 29, 1946, the defendant, acting through the Secretary of the Interior, entered into an agreement with the United Mine Workers of America covering, for the period of possession by the defendant of the mines affected by Order No. 2200, the terms and conditions of employement in respect to all mines so possessed. The plaintiff was directed by the defendant, in the form of printed instructions, to comply with all the provisions of the agreement, and the plaintiff did so.
51. (a) Directives issued by the defendant during the period May 22, 1946-June 30, 1947 required the plaintiff to increase the vacation pay and the welfare and retirement benefits of its employees in the aggregate amount of $3,-065.48.
(b) The defendant did not, during the period May 22, 1946-June 30, 1947, impose upon the plaintiff any other requirements that increased the plaintiff’s costs.
52. Except for the defendant’s actions mentioned in findings 42-51, the defendant left the plaintiff’s president free to exercise his discretion in conducting the plaintiff’s affairs during the period May 22,1946-June 30,1947.
53. The plaintiff suffered a net financial loss of $64,298.02 during the period May 22,1946-June 30,1947.[7]
54. There is nothing in the evidence to indicate that the plaintiff’s loss during the period May 22,1946-June 30,1947 *838 would have been less than $64,298.02 if the defendant had not taken and retained possession of the plaintiff’s mine during such period, or had not directed that the benefits mentioned in finding 51 (a) be provided for the plaintiff’s employees.
55. There is nothing in the evidence to indicate that the plaintiff would have been able to operate its mine during the period May22,1946-June 30,1941 in the absence of the defendant’s actions in taking and retaining possession of the mine during such period and directing that the benefits referred to in finding 51 (a) be provided for the plaintiff’s employees.
56. The plantiff did not, at any time during the period May 22, 1946-June 30, 1947, execute and deliver to the Coal Mines Administrator an instrument of agreement and certification in accordance with section 801.25 of the pertinent regulations (see finding 8).
57. Following the termination of the defendant’s possession of the plantiff’s mine on June 30,1947, the plaintiff did not comply with section 801.40 of the pertinent regulations (see finding 8).
58. The evidence fails to show that the plaintiff’s mine would have been rentable for the period May 22, 1946-June 30, 1947 if the defendant had not taken and retained possession of the mine during such period. On the contrary, the inference is warranted that the plaintiff’s mine would not have been rentable for such period because of the strike and work stoppage which occasioned the issuance of Executive Order 9728 and Order No. 2200 of the Secretary of the Interior, because it would not have been feasible for a sub-lessee to rehabilitate the mine for profitable operation during the relatively short period mentioned, and because there is nothing in the evidence to indicate that the consent of both of the plaintiff’s lessors to such a sublease could have been obtained.

Change of Ownership

59. (a) On November 21,1947, the Diamond Coal Mining Company acquired a majority of the plaintiff’s capital stock. Soon thereafter, the Diamond Coal Mining Company bought additional shares of the plaintiff’s capital stock, with the result that it then held 98 percent of the plaintiff’s total out *839 standing capital stock of 2,297 shares. All the shares acquired by the Diamond Coal Mining Company were purchased at the par value of $100 per share.
(b) Frank Garland sold all his stock in the plaintiff to the Diamond Coal Mining Company during the course of the transactions referred to in paragraph (a) of this finding.
(c) Since the latter part of 1947, the plaintiff has been a subsidiary of the Diamond Coal Mining Company.

The Litigation

60. (a) On November 27,1944, the plaintiff’s stockholders approved, and authorized the execution of an agreement effectuating, a proposal submitted on behalf of Frank Garland, Lindsay Young, Will Davis, and the Garland Coal Company (of which Frank Garland was president), whereby an existing indebtedness of the plaintiff to Mr. Garland for back salary in the sum of $8,551.20, an indebtedness of the plaintiff to Mr. Young for back salary in the sum of $550, an indebtedness of the plaintiff to Mr. Davis for expenses in the amount of $880.30, and an existing indebtedness of the plaintiff in the amount of $40,779.61 to the Garland Coal Company for commissions on coal sold by that company as sales agent for the plaintiff were settled in exchange for a promise by the plaintiff to pay over to Messrs. Garland, Young, and Davis and the Garland Coal Company, in the ratio of their several claims against the plaintiff, all funds that might be recovered by the plaintiff upon its claim against the defendant arising from the defendant’s action in taking and retaining possession of the plaintiff’s mine during the period May 1,1943-October 12,1943 pursuant to Executive Order 9340 (8 F. R. 5695).
(b) The agreement mentioned in paragraph (a) of this finding was incorporated in a written document dated February 9, 1945.[8]
(c) The claim of the plaintiff against the defendant mentioned in paragraph (a) of this finding was litigated by means of a petition filed in the Court of Claims on September 4, 1945 in the case of Pewee Coal Company, Inc. v. The *840 United States, 115 C. Cls. 626 (1950), affirmed 341 U. S. 114 (1951). The plaintiff recovered $2,241.26 on that claim.
61. As one of the incidents involved in the acquisition by the Diamond Coal Mining Company of a controlling interest in the plaintiff (see finding 59), H. K. Cook, the principal stockholder and the head of the Diamond Coal Mining Company, wrote a letter to Frank Garland under the date of November 20.1947. as follows:
I understand that under date of February 9, 1945, by written agreement, the Pewee Coal Company assigned to you, the Garland Coal Company, Lindsay Young and W. E. Davis any and all funds received or recovered by the Pewee Coal Company in its claim against the United States Government, in the amount of $40,280.00, based upon losses occasioned by the Company as a result of the taking over of the company’s properties by the Government. In return for the assignment of these funds, if received by the Pewee Coal Company, you and the above named parties agreed to waive certain outstanding salary claims against the Company.
On behalf of myself and the Pewee Coal Company, I hereby agree to continue to prosecute the above mentioned suit against the United States Government, provided all expenses of said suit are to be borne by you, and I also agree to turn over to you all notices, advices etc', concerning said suit.
62. On October 28, 1949, Frank Garland, after having employed counsel for that purpose, filed case No. 49351 in the name of the plaintiff. The plaintiff did not authorize the filing of the suit.
63. After the filing of case No. 49351, H. K. Cook, who was then the head of the plaintiff, wrote to Frank Garland on February 28,1950 a letter stating as follows:
Under date of November 20,1947,1 wrote you agreeing on behalf of myself and the Pewee Coal Company to continue to prosecute the suit which had been filed against the United States Government, based on losses occasioned as a result of the taking over of the company’s properties during the war, provided all expenses of the suit were borne by you. This letter was written in order to carry out the contract dated February 9, 1945 between you and other parties and the Pewee Coal *841 Company, whereby the latter agreed to pay the proceeds, if any, of recoveries against the Government to you and the other parties in return for the release of certain claims for compensation against the Pewee Coal Company.
I am advised that your attorney in Washington, D. C., in order to protect your interests, has seen fit to file a claim for additional losses occurring in the months following the original seizure period while the Government continued its control of the company’s properties. I hereby agree, on behalf of myself and the Pewee Coal Company, to prosecute this additional claim against the United States of America, all expenses to be borne by you, and to turn over to you any recovery realized therefrom; provided. that this agreement by me and the Pewee Coal Company is contingent on your obtaining the written consent thereto of all bondholders of the Pewee Coal Company.
64.Under the date of May 4,1951, the plaintiff (by H. K. Cook) addressed to Frank Garland a letter stating as follows:
Supplementing agreement and undertaking contained in our letters to you dated November 20, 1947 and February 28, 1950 concerning payment of proceeds from certain claims of Pewee Coal Company against the Government to you and certain associates in return for the release of claims for compensation against the Company, Pewee Coal Company hereby agrees to prosecute any suit or suits against the United States of America, based on seizure of the Company’s properties by the Government during the period of your ownership of the Company which commenced June 10,1940 and ended on or about November 22, 1947, which your attorney deems necessary to file in order to protect your interests; and to turn over to you the proceeds of any recovery or recoveries realized therefrom; provided that all expenses of such suit or suits are to be borne by you.
65. On May 9,1951, Frank Garland, after having employed counsel for that purpose, filed case No. 50140 in the name of the plaintiff.
66. All the proceedings in cases numbered 49351 and 50140 have been conducted by the counsel whom Frank Garland employed for such purposes.
*842 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States in case No. 49351 the amount of one thousand eighty dollars ($1,080), and in case No. 50140, in the amount of three thousand sixty-five dollars and forty-eight cents ($3,065.48), plus interest at four (4) percent per annum on $1,080.00 in case No. 49351 from June 21, 1944 to date of payment, and on $3,065.48 in case No. 50140 from June 30, 1947 to date of payment.

 The evidence does not show the plaintiff’s profit or loss experience since 1949.

 The regulations were originally promulgated by the Secretary of the Interior on May 19, 1943 (8 F. R. 6655) as Part 603 of 30 CFR. They were redesignated as Part 801 of 30 CFR, and were also amended to some extent, by an order which the Secretary of the Interior signed on July 29, 1943 (8 F. R. 10712). An order of the Secretary of the Interior dated August 13, 1943 (8 F. R. 11344) made some additional changes in the regulations.

 The form called for Information relative to the correct name and address of the mining company, the name of the operating manager, and the names, numbers, and addresses of the company’s mines.

 The period April 10, 1945-June 13, 1945 Is the first of the two periods that are Involved in case No. 50140. That case was filed on May 9, 1951.

 The principal change was the substitution of officials designated as Area Officers-in-Charge for Eegional Managers. The text of the regulations, as they stood during this period, will be found in 30 CFR, 1946 Supp., Part 801.

 The form called for information similar to that mentioned in footnote S.

 As indicated in finding 49 (a), the mine was shut down for approximately five months in this period because of a fire.

 Tile written document Is not In evidence.